No. 4.—ELI H. WALKER *et al.* plaintiffs in error, *vs.* MICHAEL ROBERTS, defendant in error.

[1.] When facts are such that the Jury, if permitted to hear them, may or may not make an inference pertinent to the issue, according to the view which they may take of them, in connection with the other facts in evidence, they are such as the Jury ought to be permitted to hear.

Caveat on appeal, in Jasper Superior Court. Tried before Judge HARDEMAN, April Term, 1856.

This was a caveat filed to a paper propounded as the will of J. Monroe Johnson, deceased, on the grounds, among others—

1st. Incompetency.
2d. Undue influence.
3d. Fraud.
4th. That the will was not completed.
The following is a brief of the evidence submitted:

Propounder proved by Isaac Langston (scrivener) signing and competency of testator, date of will, and that testator was 18 years old, and had been going to school at Cave Spring, and was on a visit to Thomas K. Slaughter, his uncle, when will was made.

Will written at witness' residence; Thomas K. Slaughter and testator came to his house by themselves, in a buggy; shortly after they walked in and were seated in his piazza, Mr. Slaughter said Monroe wanted witness to do him some writing; and witness asked testator what he wanted written; and he said a will. Witness sent for *Cobb's Analysis*, to John Edwards, to get a form; and Edwards brought the book, and asked what he wanted with the book, and he supposed witness also wanted him; witness replied, he wanted it for a form to write a will for Monroe; and Edwards asked testator what he wanted a will for; and testator replied, that

he was riding about on the rail road, and was afraid he would get killed; and he was a young man of large fortune, and he wanted to dispose of his property so as to hinder the Johnsons from getting any of it; and he wanted to give his property to his aunts, Slaughter and Roberts, or his uncles for them.

Testator and witness walked into the room and closed the door; and after he had gotten through the caption, testator told him that he wanted to divide his property between his uncles, Thomas K. Slaughter and Michael Roberts, and gave witness the name of the negroes, except the name of a child, he could not remember, and witness left a blank for that. When will was finished, testator called to his uncle and asked the name of the child; and his uncle said he could not recollect it, but his aunt Matilda could tell him; and nothing more was said in the room; and on the next day, at the court ground, testator told witness he had learned the name of the negro child from his aunt, and witness filled it up in the will in the presence of the testator, and the other two witnesses at the court ground on the next day. When the will was filled up, it was put in an envelop and sealed, and witness carried it home, filed it away on the same day in a desk, until he brought it to Court under a subpœna. Testator was the nephew of the wives of Slaughter and Roberts; he lived with his uncle Slaughter, after July, 1852, and had heard Slaughter say he stood security for Monroe for a pair of horses, and that Monroe was worth thirty or forty thousand dollars.

Knows nothing of Monroe being easily influenced, and that the name of the child was not put in the day the will was written; it was agreed that at the request of testator, that he should hold the will until the next day at the court ground, *and that testator and witnesses would meet there* and insert the name of the negro; that on the next day, at the court ground, testator again recognized the will, and it was filled it up by inserting the name of the negro in the presence of said testatator and both the other witnesses, under the direction of the

testator; that the testator dictated each item of the will, and witness wrote it as he dictated each, and he gave him the name of each negro; that while witness and testator were preparing the will, Mr. Edwards and Slaughter remained outside the room; and he is of the impression he read the will to testator before the witnesses came in; witness, in their presence, again read over the will to testator, who was capable, and done it freely and voluntarily, without being influenced.

JOHN EDWARDS: Confirms Langston about book and signing in the room, and his asking testator why he wanted a will, &c.; and said that testator was not insane and was not as bright as some.

When they went in the room to witness the will, Mr. Slaughter went in with the rest; and Mr. Langston read over the will and asked the testator if it was his will, and he answered it was.

. Witness recollects, as Mr. Langston has testified, it was agreed that witnesses and testator were to meet at the court ground, but can't say it was the next day, for the purpose of filling up the blank with the name of the negro.

Mr. Langston came to him at the court ground and told him that they supplied the name of the negro in the will; and he recollects that testator and the witnesses were all there that day at the court ground.

Edwards further testified, that the will was signed, and he and testator had walked out in the piazza, and testator told witness he wanted to give his property to his aunts, Slaughter and Roberts.

Testator invited the witness in the room; that Langston came to the court ground, said the name of the negro had been inserted, and he does not know whether Johnson was present or not; he was presiding that day as Justice of the Peace, and does not distinctly recollect, but he does not know that Johnson was present when Langston told him the name of

the negro was inserted, but he recollects, distinctly, that he saw witnesses and Johnson there on that day. And being asked if he recollected that Johnson recognized the will on that day, he answered, he was presiding as Justice Peace and could not recollect whether Johnson recognized the will or not.

DAVID LANGSTON: Testified that he and the other witnesses all signed the paper propounded in presence of each other.

Never saw testator before that day, and his sister came to the field after him, and that he did not remain more than 15 minutes; that he was at the court ground and saw his father insert the name of the negro; does not know that Edwards was present when the name was inserted.

E. G. CABANISS : Was appointed by the Ordinary of Monroe County, guardian of testator. By his consent, testator went to visit his relatives in June, 1852. Thomas Slaughter afterwards came and got his trunk, promising to send him back in a few days. Witness visited testator at his uncle's, shortly after he was hurt; he had but little use of himself; he was not in a situation to be moved; afterwards sent for him two young men with a wagon, and witness furnished testator with all necessaries; he was disposed to be wild and dissipated; his estate was worth $35.000; knew nothing of his marriage.

JOHN S. INGRAHAM: Taught testator; was of a yielding disposition, and easily influenced; ready at adopting the vices of others. "In a moral point of view," witness did not think he was competent to make a will; was exceedingly childish in his preferences, and had a strong animosity against those who restrained him; desired to outlive his minority, so that he might prevent certain of his relations who had given him good advice, from inheriting his property. Sometime in the year 1852, he received $50 from Mr. Slaughter of Jasper. The letter contained expressions of kindness, and an offer to send more money, if desired.

EARLY CLEAVLAND: Taught testator; does not think he

was fully capable of making a will—from the fact, that he was incapable of learning at school.

CAREY COX: Testator boarded with him in 1850; thinks he was incapable of making a will, from his reckless, careless nature; would sell his property at a great sacrifice to obtain a little money.

GABRIEL PARKS: Testified to the same with Cox; testator had a great fancy for trinkets.

L. GRESHAM and W. EVANS, D. SANFORD and J. M. HOLDER: Testified, that he was of weak mind—so far as to be easily imposed upon, especially in buying articles to which he took a fancy.

A. LANE: Taught testator two years; could learn but little; mind was weak and easily influenced; asked him on 23d September, 1852, to marry him to Miss Katherine Darden; did not come, having been hurt on the way.

B. PYE: Knew testator, and had heard him talk; was of the opinion that he was not competent to make a will.

JAS. H. JOHNSON: Testator was of weak mind and easily influenced; on his way to be married, his horses ran away with his buggy, and gave him a large wound on the back of the head; after he got better, he requested witness, on Friday, to come back on the next Tuesday and carry him to the house of Maj. Darden to be married; on Sunday night thereafter, he received another wound on the head.

THOMAS SLAUGHTER said: That he and his wife had retired to sleep, and in the night about 10 o'clock, he heard an unusual noise in testator's room; he got up and took a light and found testator on his bed in a gore of blood. Afterwards, he (witness) went with Cabaniss to Mr. Slaughter's and found him drunk; Slaughter commenced abusing Cabaniss for not coming sooner; witness remonstrated with him, and he then got up; washed his face and treated Cabaniss respectfully. After dinner, Slaughter said the negroes were going round the house with a light and heard testator groaning, and awoke him, (Slaughter,) and he went to his room, got a light and found him lying on the hearth in a gore of

blood; testator told witness not to let any one know of his appointment to leave Slaughter's the next Tuesday; has known men with less sense, who were money-making men; he did not express any fear of being killed at Slaughter's.

B. S. DARDEN: Went to school with testator; he told witness that the Johnsons should not have his property; that he had made a will, and given it to his uncles, Slaughter and Roberts; he told witness at another time, after he was hurt by his horses, at Mr. Slaughter's, that he wanted witness to get his horse and go away from there, for he was afraid he would be killed if he stayed there.

JOHN HINES: Sold testator, in the summer of 1852, two gray mares for $365, and took his note, with Mr. Slaughter and Mr. Maddux as sureties; thinks he was of weak mind, and easily influenced.

FRAN. M. SWANSON: Dealt with testator, and heard him say he had willed his property to his uncles, Slaughter and Roberts; considered him competent to make a will.

F. JENKINS: Knew testator from a child; heard him say the Johnsons should not have his property; that he intended giving it to his aunts, Slaughter and Roberts; and afterwards, that he had given it; saw him on the day he was hurt, when the horses ran away.

THOMAS J. CONNOR: Had dealt with him, and considered him competent to make a will.

E. MADDUX: Was at Slaughter's when testator started to get married; Slaughter asked him when he was coming back; said he would come back when he raised his screw, and would then get drunk; Slaughter replied, bring Katy with you; in an hour, they heard his horses had run away; Slaughter said let's go; and they went to where testator was; he was taken to Mr. Slaughter's. It appeared that the horses took fright from a pile of hewn timber; witness saw him the night he received the second hurt; they did not send for a physician, because it looked like he would die that night; there were no tracks from the road to the house.

S. C. TALMAGE: Sold testator a fine buggy; and within

three months, sold him another; Slaughter stood security; thinks he was competent.

W. W. ANDERSON: Knew testator, and thought him competent.

DR. MADDUX: Attended on testator when he was first hurt; the Sunday evening before the second hurt, witness was at Mr. Slaughter's; testator was eating muscadines or grapes, near half a gallon; witness took them away from him; such a quantity might produce apoplexy, convulsions or other such disease; on Monday went to see him, at the request of E. B. Darden, and found him with his skull broken above the left temple, and himself paralyzed all over; Slaughter asked witness who sent him, and said he was glad he was come; that he would have sent for him, but they had a consultation and concluded he would die any how; he got able to go about again a little; died in March, 1853; thinks it possible the wound might be inflicted by falling on a rock or fire-dog; but never knew the fall of a man to make such a wound; thinks him not very sensible, but capable of making a will.

C. D. BOSTICK: Was at Slaughter's the Sunday night before testator was to be married; he came in and asked for the brandy-house key; Slaughter gave it to him; and shortly they heard a noise in the brandy-house, and Slaughter said testator would go into every barrel; Slaughter told testator he would kill himself in five years if he kept on drinking, and he had better quit; testator bet him a watch worth $200, that after he got married, he would drink no more till 1856. After they retired, testator showed witness two gold watches, and said he did not care if his uncle did win one, as he bought it for him; that he looked upon him as the best friend he ever had, and he wanted him to have his property; that he had made his will and given his property to his uncles, Slaughter and Roberts.

CAVEATORS: Proposed to prove that when the two men sent by Cabaniss, in the latter part of 1852 for testator, came to Slaughter's his conduct was very harsh and disres-

pectful. The Court rejected the evidence, and caveators excepted.

In the argument to the Jury, Counsel for caveators contended that the presence of Slaughter and the declarations of testator, during the *factum* or *res gestæ*, created such suspicion against the will, that in weighing the testimony, if the Jury were in doubt about any fact, the presumption of law was not, as usual, in favor of the paper propounded, but against it. And in conclusion, Counsel for propounder expressed his astonishment that caveator's Counsel would so misinterpret the law; and that under the law that he had read to the Court, the presumption of law was in favor of the will, when the doubt was as to capacity.

And Counsel for caveators explained his position, and Counsel for propounder admitted there was no controversy between them with the explanation.

The Court notified Counsel that he desired their request in writing, but would charge on any point when requested, as he was bound to do by ruling of the Supreme Court; and the Court being much engaged about his charge, did not give the subject above alluded to in charge at all to the Jury; and to this plaintiff in error excepts.

In the charge, amongst other things, the Judge charged the Jury: "But it is alleged that the will was incomplete, and that other acts were to be performed in order to its completion, viz: the insertion of the name of another negro.

The Court charged, that if a blank was left in will with a view that the name of a negro should be thereafter inserted, and that name was to be inserted before the will was to be considered complete, then such name ought to have been inserted by the consent of the testator in the presence of all the witnesses; but if, when the will was signed, that it was considered complete except as to the insertion of the name of the negro, then the insertion of the name of the negro, by the consent of the testator, even though all the witnesses may not have been present at the time of the insertion of the name

of the negro, would not invalidate the will except as to the negro inserted, if it did that; and Counsel excepted.

The Jury sustained the will, and caveator moved for a new trial—

1st. Because the will was never finished.

2d. Because the verdict was contrary to law and evidence.

3d. Because Johnson's testimony about harsh and disrespectful conduct was ruled out.

4th. Because the Court erred in declining to give, when requested by caveators in writing, the following charge, to-wit: "That insanity or partial insanity only, upon a particular subject or as to a particular person, is unsoundness of mind; and if the will be the offspring of such insanity, it will be invalid, although the general incapacity be wholly unimpeached."

5th. Because the Court also declined to charge at like request: "That when the testator is a person of weak judgment, and easy to be persuaded, and the legacy great, and the principal legatee accompanies such testator and remains in attendance 'til the will is executed, that creates such suspicion as requires the Jury to view the transaction with jealousy; and the Jury must be satisfied that the testator understood the contents of the will."

Notwithstanding, the Court in declining, said to the Jury: "that he could not give it in that language, but that he already had instructed them that they might take into consideration all the circumstances of the case in ascertaining if there were fraud or undue influence.

The Court refused a new trial.

On these exceptions error was assigned.

O. C. GIBSON; BARTLETT, for plaintiff.

LOFTON; D. J. BAILEY, for defendant.

*By the Court.*—BENNING, J. delivering the opinion.

Among the grounds of caveat to the will in this case were

these: that Thomas K. Slaughter, a chief legatee, procured the execution of the will by the use of fraud, of violence, and of undue influence towards the testator. In one of the specifications it is said "that said Thomas K. Slaughter, by violent and lawless conduct, for a long time before said will was executed, and always afterwards, had and exercised control over the will of said James M. Johnson, through the fears of said James M. Johnson, that said Thomas K. would do or cause to be done him great bodily harm."

The violent and lawless conduct existed, it is charged, "for a long time before said will was executed and *always afterwards.*"

The object of this specification, probably, was to charge that Slaughter's lawless and violent conduct, existing before the will was written and afterwards, as long as the testator lived, was the cause both of the testator's making the will and of his never revoking it. But this, if the object, is rather obscurely expressed.

The testator, when he made the will, was under age; was about eighteen years old—he died under age.

At the time when he made his will, he resided in Jasper County—he had been residing in that county for some months before.

Cabaniss, who had been appointed his guardian, resided in the County of Monroe—Cabaniss had, however, before the making of the will, ceased to be his guardian, by becoming the Ordinary of Monroe County. But Cabaniss thought that he still had the right to act as guardian, until a new guardian should be appointed, and therefore, that he had the right to the custody of the testator. And, accordingly, he continued to act as guardian and tried repeatedly to get the testator from Jasper to his house in Monroe. To effect this object, he, on one occasion, sent two young men to Slaughter's for the testator. These young men went to Slaughter's for the testator. And in reference to this visit the bill of exceptions has the following statement: "And when James H. Johnson was giving in his evidence, caveators, after proving by him,

that after the second hurt of testator he was applied to by a Mr. Holder and another gentleman to accompany them to Mr. Slaughter's, with a letter from Mr. Cabaniss to the witness, asking him to go with them to Mr. Slaughter's, and who were sent over by Mr. Cabaniss to carry testator to Forsyth; witness directed the gentlemen to go on and he would overtake them, but they arrived a few minutes in advance of him ; and when he tied his horse he heard Mr. Slaughter's voice in an angry tone.   Then caveators offered further to prove, that the conduct of Thomas K. Slaughter, upon that occasión, to those two young gentlemen, was very harsh and disrespectful to them."

"And this testimony, so offered to be proven, was ruled out by the Court, on the ground that the evidence was not relevant, because Mr. Cabaniss was not guardian of testator, and had no right to intermeddle with testator in any respect."

Was this decision right?

One of the issues was, whether the will was first brought into existence and was then kept in existence by the lawless and violent conduct of Slaughter.

Now any facts going to show that Slaughter, whilst the testator was staying at his house, by rudeness, insults, threats, commands or other harsher conduct, prevented the friends of the testator or the messengers of those friends, from having free and private access to him, or from removing him if it was his wish to be removed, would be evidence from which, in connection with the other evidence, a Jury might or might not make the inference that Slaughter held the testator in his power and under his control and intended to continue doing so ; and if this should be the inference the Jury would make, they might or might not go further, and make the additional inference that Slaughter was using this power and control for the purpose of keeping the testator up to the will he had written and preventing him from changing it; that is, for the purpose, virtually, of procuring him to let the will, as written, become in law his will.   A writing cannot,

in law, be a will, until after the death of its author. To pre-vent a man from changing a writing intended for his will is, therefore, to procure him to make a will.

If, therefore, the facts of which Johnson would have testi-fied would have been such as these, they would have been per-tinent to the issue aforesaid. The Court, therefore, should have heard them; and if it had found them such, it should have admitted them to the Jury.

When facts are such that the Jury may or not make from them an inference pertinent to the issue, they are such as ought, in general, to be admitted in evidence to the Jury.

The Court below considered the facts in question as rendered irrelevant, by the fact that Cabaniss had ceased to be the guar-dian of the testator; and therefore, had ceased to have any right over him. Still, it does not appear that Cabaniss had ceased to be a friend of the testator. And if he occupied that rela-tion, the evidence, in the view we have taken of the subject, was admissible, especially as the testimony of one witness, Johnson, was, that " testator told witness not to let any one know of his appointment to leave Slaughter's house the next Tuesday ;" and of another, Darden, was, that " he" testator, " had told witness at another time, after he was hurt by his horse at Mr. Slaughter's, that he wanted witness to get his horse and go away from there, for he was afraid he would be killed if he stayed there."

But, indeed, so far as the question of the motives of Slaugh-ter for his conduct to the two young men sent from Cabaniss for the testator is concerned, it is very doubtful whether that question is at all affected by the fact that Cabaniss had ceased to be guardian for the testator, and had ceased to have any control over him; for although this was really so, yet Slaugh-ter did *not believe* that it was. He thought as Cabaniss did, that Cabaniss's power as guardian still remained. This is shown by his promise to Cabaniss, made at the time when he went to Cabaniss's for the testator's trunk, to send the testa-tor back to him in a few days; and also by his demanding, and receiving payment from Cabaniss as guardian, of an ac-

Walker *et al. vs.* Roberts.

·count which he had for the board and some other expenses of the testator.

[1:] We think, therefore, that the Court should have heard the testimony of the witness, Johnson, as to what occurred at the time when the two young men went to Slaughter's for the testator; and that if that testimony had turned out to be such that the Jury, on hearing it, might or might not have inferred from it, in connection with the other testimony in the case, that Slaughter had the testator in his power or under his control, and in order to prevent him from making any change in the will, intended to keep him so regardless of his, the testator's wishes on the subject, then that the Court should have admitted the testimony to the Jury.

We are not sure that we understand the charge made by the Court, as to the *blank* in the will. Supposing, however, the Court's meaning to have been this: "If the testator, in leaving a blank in the will for a negro's name, intended the will not to be operative as to the other negroes and other property mentioned in it, until the blank was filled, then the will did not become complete until the blank was filled, and filled in the presence of those witnesses; but if the testator, in leaving the blank, intended that the will should be operative as to the other negroes and other property mentioned in it, whether the blank was ever filled or not, then the will was complete as to those negroes and that property, whether the blank was ever filled or not; and, if the blank was filled afterwards, whether the filling of it was done in the presence of the witnesses or not, was a question which could affect the will's operativeness only as to the negro whose name was inserted in the blank, and not as to the other negroes and other property mentioned in the will." Supposing this to have been the meaning of the Court, the charge, it is clear, was right.

The evidence did not, as it seems to us, authorize the following request:

" That insanity, or partial insanity only, upon a particular subject, or as to a particular person, is unsoundness of mind;

and if the will be the offspring of such insanity, it will be invalid although the general capacity be wholly unimpeached."

The objection which the Court made to giving the remaining request in charge, was founded upon the language of the request. And the language of the request does seem to us objectionable, even if it be such as may, perhaps, admit of an interpretation expressive of a true legal principle. What connection is there between the last clause of the request and any of the preceding part of it? And then, practically, what guide is it to a Jury to tell them that a transaction is to be viewed " with *jealousy ?*"

The circumstances enumerated in the request would, if they existed, be such as doubtless ought to raise a "*suspicion;*" but a suspicion of what? A suspicion of *undue influence* or of *fraud, &c.*—a suspicion that should, unless wiped off by other circumstances in the case, prevent the will from being established. The request, if stated after this fashion, would have been free from objection.

In granting the new trial, therefore, our decision is put upon a single ground : the refusal of the Court to hear what the witness, Johnson, had to say about what occurred at Slaughter's when the two young men went there for the tes tator.