The motion for new trial by the caveators of a will, besides the general grounds, contains two special grounds: (1) that the judge in his charge limited the question of insanity to old age, whereas there was evidence to support their averment that the testamentary capacity of the testatrix was affected by pellagra; and (2) that the judge erred in failing to submit to the jury the question of undue influence.
1."Old age and weakness of intellect resulting therefrom does not, of itself, constitute incapacity" to make a will. Code, § 113-205. "A person has testamentary capacity who understands the nature of a testament or will, viz., that it is a disposition of property to take effect *Page 54 
after death, and who is capable of remembering generally the property subject to disposition and the persons related to him by the ties of blood and affection, and also of conceiving and expressing by words, written or spoken, or by signs, or by both, any intelligible scheme of disposition. If the testator has sufficient intellect to enable him to have a decided and rational desire as to the disposition of his property, this will suffice." Slaughter v. Heath, 127 Ga. 747
(57 S.E. 69, 27 L.R.A. (N.S.) 1); Griffin v. Barrett, 183 Ga. 152, 163, 164 (190 S.E. 2), and cit. While there was testimony for the caveators that the testatrix, who was 74 years old when the will was executed, had suffered from pellagra for about 15 years, and that this disease had "affected" her mind and rendered her mentally "weak," and there was medical testimony that she was "in the advanced stages of pellagra," which "would affect" and "had affected her mind," there was no evidence to indicate that the disease had deprived her of the capacity of remembering her property and children, and of otherwise making a rational testamentary disposition, under the preceding rules, so as to destroy her capacity to make a will. Accordingly, the failure of the judge to charge the contention of the caveators as to pellagra was not reversible error, since there was no testimony going to indicate that the pellagra, although weakening her mind, had affected her testamentary capacity.
(a) Nor should the case be reversed on the general grounds, since under the disputed evidence it cannot be said that a verdict was demanded in favor of the caveators on the general question of testamentary capacity.
2. An attack on a will as having been obtained by undue influence may be supported by a wide range of testimony, since such influence can seldom be shown except by circumstantial evidence. Thus, a confidential relation between the parties, the reasonableness or unreasonableness of the disposition of the testator's estate, old age, or disease affecting the strength of the mind, tending to support any other direct testimony or any other proved fact or circumstance going to show the exercise of undue influence on the mind and will of the testator, are relevant. While the quantity of influence varies with the circumstances of each case, according to the relations existing between the parties and the strength or weakness of mind of the testator, the amount of influence necessary to dominate a mind impaired by age or disease may be decidedly less than that required to control a strong mind. Dean v. Littleton, 161 Ga. 651 (4), 654 (131 S.E. 507); Stephens v. Bonner, 174 Ga. 123 (162 S.E. 383); Evans
v. Arnold, 52 Ga. 169 (4), 182; Walker v. Roberts, 20 Ga. 15, 25; Smith, v. Smith, 75 Ga. 477 (4); Davis
v. Frederick, 155 Ga. 809 (5-7) (118 S.E. 206); Peretzman v. Simon, 185 Ga. 681 (196 S.E. 471); Griffin v. Barrett, 185 Ga. 443 (195 S.E. 746); Gaither v. Gaither, 20 Ga. 709, 721; Code, § 37-706; Trustees of Jesse Parker Williams Hospital v. Nisbet, 191 Ga. 821 (14 S.E.2d 64).
(a) The evidence, taken as a whole, while not demanding a verdict in favor of the caveators on the ground of undue influence, was sufficient to raise an issue, which the jury should have been permitted to determine.
Judgment reversed. All the Justices concur, except Wyatt, J., disqualified.
 No. 14740. NOVEMBER 30, 1943. REHEARING DENIED DECEMBER 10, 1943. *Page 55 
Olin Fowler, a son of Mrs. Fannie Fowler, who died on February 4, 1942, filed a petition to probate a will, which she had executed on March 4, 1940, and in which she left him her real estate consisting of a tract of 85 acres as described, all of her personal property, and named him as executor. Four of the children of the testatrix filed a caveat, in which they alleged that, at the time the will was made, she was over 74 years old and had for many years been suffering from pellagra, and was then mentally incapable of making the will; that the execution of the will was obtained by undue influence of the propounder, in that she was then "feeble in body and mind and easily influenced and persuaded;" that he obtained such influence over her by flattery, threats, and fears of his violence, with acts as alleged, so that she would never leave his home to visit her other children because of his objections and refusal to allow her to do so; and that the "pretended will is not the will of their mother, but is the will of [the propounder] who dominated by threats and otherwise the entire life and thought of their mother."
On appeal to the superior court by the caveators from a judgment probating the will, the judge submitted to the jury the question of mental capacity, but refused to submit any question as to undue influence. The jury found in favor of the will, and the judge refused a new trial. The caveators excepted on the general grounds; and because of the failure to charge their pleaded contention as to the effect of pellagra and old age on the mental capacity of the testatrix. They also excepted on the ground that under testimony, as they quoted, the judge erred in refusing to submit to the jury the question of undue influence.
There was evidence that the testatrix was 76 years old at the time of her death, about 2 years after the execution of the will; that she had suffered from pellagra for over 16 years; that this disease had "affected her mind, . . had affected her mentally and physically . . made her mind weak, and in her latter years she was a person who was easily persuaded;" and there was medical testimony that she "was in the advanced stages of pellagra, and that advanced stages of pellagra had affected her mind." However, there was no evidence as to whether or how the pellagra had *Page 56 
affected her capacity to make a will, with respect to knowing her property and her children or forming a rational plan of testamentary disposition.
As to the alleged undue influence, there was evidence for the propounder of the will, which wholly negatived its existence. However, for the caveators there was evidence going to support this averment. R. M. Fowler, a son of the testatrix, testified that after his father died in 1924, he lived with his mother on the farm in question until 1931, when he moved to Warm Springs to go in business there; that after his mother had lived with him a few months in town, she went back to her farm with his brother, Rufus, and they lived there together about three years, until 1934, and after he left, she lived for several years with tenants and other sons on the farm, except a year or two with one son at Manchester, and finally was living with the witness at his house, when Olin Fowler, the propounder of the will, came to see her for the first time since 1924, after having been on the chain-gang part of the time, and not having done anything for his mother since 1924. The witness testified that it was about 1939 or two years before his mother died, when Olin invited the mother to his house, and moved her things there, and she lived with him until her death; that his mother was "weak mentally and physically," and "easily persuaded;" that on one occasion while she was living with Olin Fowler, she sent for help when there was a disturbance going on, and the witness sent the officers there; that Olin "drank a good deal," and his mother told the witness that "she was afraid of Olin when he was drinking;" that two or three times the witness went to get his mother to spend the day with him, and she would say she would come; but after going back in the room to dress, "and Olin's wife went back in the room with her," his mother "came back and said she couldn't go; that she believed she had better stay there;" and never did come to the house of the witness for a visit "after she went to live with Olin Fowler."
Rufus Fowler, the oldest child of the decedent, testified to like effect as to the pellagra from which his mother had suffered, and that "she was easily persuaded;" that she had never previously shown "any difference in the degree of affection among her children. She treated them all alike . . said she wanted to treat all of her boys and children alike;" that she "stayed down there *Page 57 
with Olin about two years just prior to her death;" that "she asked me [Rufus Fowler] about a year and a half before she died what I thought about her having a contract made. That was a short time before she went to live with Olin Fowler the last time. She told me that she was going to have Mr. Hatchett to draw up a contract. She said that Olin and his wife wanted her to make a will; but that she would guarantee me that this contract that Mr. Hatchett drew up was going to stand as long as she lived. She told me she was not going to make a will," that "all of you boys are going to have an equal part, I am not going to make a will;" that she did on one occasion come to the witness's house one afternoon, but the last time she was living with Olin Fowler, the witness had "tried to get her to come stay with me some. She would promise me that she would go with me, and when she would talk with Olin, she would not go with me;" that "Olin Fowler was present when I was talking to my mother;" that the witness did not "know what he said to her in the house, but she was always willing to go until she went in the house."
Ed Fowler, another son of the decedent, testified as to pellagra having "made her mind weak," and that in her latter years "she was a person who was easily persuaded;" that during the last two years of her life when she lived with Olin Fowler, the witness "used to try to get her to go home with me . . she would set a day to go and me and my brother Al would go out there, and she would say she would be ready in a few minutes, and she would go back in the house and then come back to the door and say,`Ed, I just can't go,'" that "she never left the house to visit anybody after she went to live with Olin Fowler;" that "during the preceding 18 years she had constantly lived with the rest of her children; she had visited around among her children until she went to live with Olin Fowler." This witness further swore that he had visited in Olin's home "time after time when he would be either drunk or drinking, and a lot of times he would have them all nearly scared to death; my mother . . was there during those times when he would be drunk, and she would see him in that condition; sometimes he would threaten to kill them all: my mother told me that he had threatened to kill her and the whole family and I came back to town and got Hoke Smith to go out there and try to control him;" that this happened "several years back; it has been less than five years, but I can't name the date." *Page 58 
Hoke Smith testified that he was a deputy sheriff, and had occasion "to go to Olin Fowler's place a number of times;" that "when I got there, I asked for [the deceased Mrs. Fowler];" that when he knocked on the door of her room and got inside, she said: "You see, I am here in this room. There is so much whisky being made and liquor drinking around here, and so much trouble going on until I am scared to death all the time. I said, `who are you afraid of?' She said, `I am afraid of Olin.' I said,`Mrs. Fowler, he is your son, what are you scared of him for?' She said, `Well, he gets drunk and he don't know me from anybody else;'" that the mother "told me that she was afraid of Olin Fowler;" that he thought this last occasion, when he went out there and saw the mother, "was along about the year 1939;" and that he had left Warm Springs and was not a deputy sheriff after about August 15, 1940.
Alvin Fowler, another son of the decedent, testified that during the last two years of her life, "while she was living out on the farm with Olin Fowler, I had an occasion to go out there practically every Sunday. I guess I tried about forty times to get my mother to come visit me. I would say, `Mamma, how about coming and staying a few days with me?' She would say, `All right, come out next Sunday and I will go.' I would go out there and she would go in the house and say, `I will be ready in a few minutes,' and in a few minutes she would come back out and say, `I can't go this time.' She never did visit me any while she lived with Olin; and she never visited any of my other brothers while she lived there with Olin. My mother told me that at times Olin was good to her and at times he was mean to her."
Talmadge Ward, a son-in-law of Rufus Fowler, testified that Olin Fowler "came to" the witness "in Manchester one night when the first trial came off and asked me what I knew about it? I said, `Nothing.' He said he had it fixed like he wanted it. That was after the will had been made and just a few weeks before the first trial."
J. F. Hatchett testified that he was an attorney, and had represented the deceased mother and her deceased husband during their lifetimes; that she "and Olin Fowler came to my office in reference to drawing a contract about a year and a half or two years before she died. Olin did the greater part of the talking . . they told *Page 59 
me what agreement they had made, and she said that was true, and wanted me to put it in writing, which I did. I made a copy of the contract. I gave one to [her] and one to Olin. I did not hear any more from either one after I fixed up the contract. I did not hear anything about the will until after she died. That was the first time I knew it. The contract was signed in my office by both of them. We called for the contract on the other trial, and Mr. Fowler swore they were destroyed . . they entered into an agreement in the contract that Olin was to move back to the farm down there and he was to fix up the porch and cover it, and he was to cut some timber . . and saw it up and fix up the place, and he was to take care of her for the balance of her life for the rents of the place. They did not say anything to me about making a will. I wrote out the contract and then turned around and read it to them, and she signed it and Olin signed it. Both of them told me that was what they wanted."
As to this contract, Olin Fowler testified: "My mother did not ask for a contract to be made. She told Frank Hatchett . . `I want a deed made out to Olin, he is going to go out and build up the place and take care of me.' He said, `No, I am not going to write you a deed. I will draw you up something good as a deed.' My mother said, `I will talk with him about it.' He said, `I can't talk with you now about it; but I will mail it to you in a few days.' Three or four days after that the contract came. My mother called me in there and told me . . "This is not what I told Frank Hatchett I wanted. What would you do with it?' I said, `Do as you like.' She said, `Can't I get it fixed like I want?' I said, 'Yes, a lawyer is supposed to fix it like you want it, when you pay them.' She threw it in the fire. . . She wanted to come back and have it fixed like she wanted it. I did not use any undue influence or threats of any kind to get her to destroy that contract;" and that they afterwards went to see Judge R. A. McGraw, another attorney, who drew the will in question and another contract on the same day that the will was signed.
In reply to this testimony, J. F. Hatchett, when recalled as a witness, testified: "I heard Olin Fowler say that I did not write the contract while they were there. That is not true. They were written while they were present and were read to them and given to both of them. No deed was mentioned in my office."
The last contract, which bore the same date as the will, March *Page 60 
4, 1940, and according to testimony for the propounder of the will was executed by the testatrix and Olin Fowler just before the signing of the will, was in evidence. This contract provided in effect that the son was to take the mother "into his home and to feed, board, clothe, and administer" to her for the remainder of her life and furnish to her medical and funeral expenses, in consideration of which she agreed to make a will devising to him all of the described land in question; that if the son died before the mother, the wife of the son and the mother would agree as to whether the wife should assume the son's obligations, and if they so agreed, the wife would have the son's obligations and his right as to the making of a will in her favor; that if the mother should become dissatisfied with this contract, the son and his wife were to have a debt against the mother's estate for all money spent in her behalf under the contract; and that the mother would not sell, incumber, or dispose of the land contrary to this agreement.
As stated, there was testimony by Olin Fowler and witnesses in his behalf going to sustain the testamentary capacity of the mother, and his contention that the will and the final contract just mentioned had both been executed on her own volition and free from any undue influence on his part.
The case was tried on May 18, 1943. Olin Fowler also testified that, while he had "been to the chain-gang for possessing whisky," and "to the asylum for drinking whisky," this "coming September will be five years since I have touched a drop of whisky or a drop of beer. I have been living like a man since I went to the chaingang and the asylum. I never at any time requested my mother to make a deed or a will." He also gave detailed testimony as to why the will and the contract, made on the same day, were executed.