59252, 59302. CHAMBERS v. THE STATE. (two cases).

BIRDSONG, Judge.

Violation of the Georgia Controlled Substances Act. Relevant evidence shows the following occurrences, either by way of direct evidence or reasonable inferences that could have been drawn by the jury. Agents of the State Drug Enforcement Agency were informed by one Capaldi that he (Capaldi) could help the agents make a "buy" of 20,000 Quaaludes, a Class II prohibited drug (Methaqualone). The selling price was to be $2 per tablet or a total of $40,000. The buy was to be from "Maddog," a name admitted to by the appellant David Chambers. After some discussion and deliberation as well as confirmation of the identity and quality of the drug by the delivery of eight tablets representative of the tablets to be bought, the agents arranged to make the "buy." Capaldi exacted a promise from the agents that he (Capaldi) would be paid $500 and that his probation would be transferred to another state.

On the day of the sale, Capaldi and his girl friend, Kacon, were met by agents of the Drug Enforcement Division. A telephone call was ostensibly made to "Maddog" and arrangements made to deliver the "ludes" to a parking lot of a motel. This call was made in the presence of several officers. The arrangements were that the sale would take place at about 2 p.m. One of the agents was the "bag" man or money man. The officers had been able to accumulate only $15,000 for the buy. The plan was that Capaldi would use this $15,000 to show "Maddog" and as soon as it was determined that all 20,000 "ludes" were present at the scene of the sale, the "bag" man would be signaled and ostensibly bring the remainder of the money to "Maddog." In fact, the agents were to use that same signal (to bring the money) as the time to make the arrest of the sellers.

At about 2 p.m. the appellant David Chambers drove up in a car and parked next to Capaldi and his girl friend Kacon. David Chambers got out of his car and entered Capaldi's car. Prior to David Chambers' arrival, the officers had placed an electronic listening

device (a bug) in Kacon's purse because Capaldi thought it was too dangerous for him to have it on his body. When David Chambers entered Capaldi's car, Capaldi addressed him as "Maddog" and showed Chambers the $15,000. Chambers acknowledged that there was $15,000 and apparently made a fast count. Chambers was shown the nearby presence of the "bag" man who ostensibly had the remainder of the $40,000. Chambers then left and apparently met his brother Henry Chambers (also known as "Nick") and obtained 10,000 "ludes" from Nick. David Chambers then drove back to the parking lot where Capaldi was parked. Capaldi and Kacon got out of their car and entered David Chambers' car. Capaldi left the car door open with one foot on the floorboard and one foot on the parking lot. Capaldi reached into each of two paper bags on the floorboard of Chambers' car and removed therefrom at least one clear plastic bag from each paper bag, which plastic bags contained white pills. Capaldi held these bags high enough that the surveilling officers could see both the bags and the contents. Tablets removed from these bags after the subsequent arrest of the appellants tested positively for methaqualone. David Chambers at this time informed Capaldi that he (David) only had 10,000 of the pills and that his brother (Nick) was bringing the other 10,000. While the three (David Chambers, Capaldi, and Kacon) were waiting in Chambers' car, Chambers was overheard via the bug to say to Kacon that as a sign of his good faith, he (Chambers) would give Kacon a "hit of coke." After the arrest, Kacon surrendered a small plastic bag containing white powder as that which had been given to her by David Chambers. After waiting a few moments, Kacon was told by David to call Nick and he would answer his "beeper." Kacon went to a telephone and made a call. Because of interference, the bug did not transmit this particular call to Nick. Nick apparently then contacted Charles George, the third person indicted by the state for the possession with intent to distribute the Quaaludes in question. George met Nick in the parking lot of a nearby department store. George had possession of the remaining 10,000 "ludes" and was to deliver them to Nick who in turn was to deliver them to David Chambers. At their meeting, Nick told George that David had already delivered 10,000 "ludes" had talked with the "people," had the money and was counting it. However, Nick suggested that George follow Nick to see that they "were not ripped off." George was armed with a pistol and had an attack dog in the back of his truck. Both Nick and George drove to the parking lot where the sale was to be consummated and parked near Capaldi and David Chambers. Capaldi got out of David Chambers' car and got into the pickup being driven by Henry Chambers (Nick). Following a brief conversation with Nick, Capaldi

got out of the cab of the pickup and walked to the back of the truck. Capaldi opened a yellow valise or suitcase and an officer surveilling the scene saw that the yellow suitcase contained several clear plastic bags containing white pills of the same type as previously seen in the bags in David Chambers' car. Capaldi closed the bag and removed the bag from the back of the pickup and placed the yellow bag on the ground at the rear of the pickup. Capaldi gave the signal to the "bag" man that all 20,000 "ludes" were now available. The "bag" man started over toward the Chambers brothers whereupon the other officers closed in and made the arrests. The contents of the bags in David Chambers' car and the yellow bag on the parking lot ground were seized.

Appellants David and Henry Chambers in effect admitted that the Quaaludes had been found in their possession but seek to avoid any criminal responsibility by asserting the defenses of coercion and entrapment. In substance, their testimony showed that David was contacted by Capaldi by telephone about four weeks before the arrest. Capaldi asked David to obtain some Quaaludes. David declined to do so. Over the next few weeks, both Capaldi and Kacon conversed by telephone with both David and Nick seeking their cooperation in obtaining some Quaaludes. Each time both brothers declined to take any part in the effort. Two or three days before the arrest, both Capaldi and Kacon started uttering threats and finally threatened to put the brothers "in the river to see if they would float" if they did not cooperate. The brothers each stated that David was aware of Capaldi's background and reputation for violence and believed that Capaldi's threat was real. Each stated that he felt threatened and that his life was in danger if he did not cooperate with Capaldi. The final instructions given by Capaldi to each brother were that they were to go to a department store parking lot and there they would find a particular car parked on the lot. This car contained two paper bags and a yellow suitcase. One brother was to take the two bags to a designated area at a motel parking lot. The other brother was to follow shortly thereafter and bring the yellow suitcase to the same location. Capaldi had promised some financial remuneration for their trouble. The two brothers did as they were instructed because and only because of their fear of Capaldi. Immediately after Nick arrived in his pickup with the yellow bag, they were arrested. Charles George's presence at the scene was accounted for by the contention that he had followed Nick, apparently after having passed Nick on the street, so that George could show the brothers the dog in George's truck. David explained away the "hit of coke" as a simple offer by David to Kacon to take a drink of Coca-Cola.

In rebuttal the state offered the immunized testimony of George to the effect that some weeks before, Capaldi had purchased 2,000 Quaaludes from the Chambers brothers and still owed them $4,000. Capaldi had then again contacted the brothers and informed them that he (Capaldi) had a buyer from Chicago who wanted to buy 20,000 "ludes" at $2 a pill. Nick agreed to forgive the $2,000 if Capaldi could set up the $40,000 sale. The pills had been distributed among Nick, George, and one "Glen" so that if anyone had been "busted," all the pills would not be lost. When George met Nick, Nick told George that he (Nick) had already delivered 10,000 pills to David and that everything was all right and David was already over there counting the money. George surrendered possession of the remaining 10,000 "ludes" to Nick and stated that he had brought the attack dog and a gun to the meeting with Nick as back-up protection for the sale. George testified that the pills had been obtained in Nicaragua and that there had been 100,000 of them. Nick was ready to deliver the remainder of the pills and collect the rest of the money. George also testified that neither of the brothers ever expressed concern for their safety or fear of Capaldi.

The trial court instructed fully on the principles of coercion and entrapment as well as on the credibility of an accomplice. At the conclusion of the state's case and again at the conclusion of all the evidence, each of the appellants moved for a directed verdict of acquittal. David Chambers also moved for a judgment n. o. v. of not guilty and for a new trial. Henry (Nick) also moved for a new trial. All these motions were denied. Each appellant filed separate enumerations of error but these have been consolidated and will be considered in this one opinion. Henry Chambers enumerates twelve alleged errors, and David four. These will be considered together where possible. *Held:*

1. The first enumeration by David Chambers and the first four enumerations by Henry Chambers deal with the denial of the motions to direct a verdict of acquittal because it is asserted that the defenses of coercion and entrapment were established as a matter of law. Several interlocking arguments are here advanced by the appellants. First, they argue that as a matter of law, their sworn testimony establishes a defense of coercion and entrapment. Because none of the officers of the law nor George were privy to any of the conversations between the brothers and Capaldi or Kacon, appellants' testimony stands unrebutted. The arguments continue that because the coercion and entrapment defenses are established as a matter of law and can only be rebutted by Capaldi or Kacon, inasmuch as neither Capaldi nor Kacon were called as witnesses by the state, the convictions cannot stand. See *Robinson v. State,* 145

Ga. App. 17 (243 SE2d 257).

As we construe appellants' arguments, the elements of coercion and entrapment are intertwined. That is, the coercion caused the entrapment. Looking first to the issue of coercion, we conclude that the evidence does not reasonably establish coercion so as to require the direction of a verdict of acquittal as a matter of law. Coercion involves the involuntary performance of a criminal act under fear of threats or menaces involving a direct danger to life or great bodily injury where the danger is abated only by the performance of the criminal act. Ga. L. 1968, pp. 1249, 1274 (Code Ann. § 26-906). In order for duress or fear produced by threats or menaces, to be a valid legal excuse for doing anything which would otherwise be criminal, the act must have been done under such threats or menaces as show that life or member was in danger, or that there was reasonable cause to believe that there was such danger. The danger must not be one of future violence but of present and immediate violence at the time of the commission of the forbidden act. *Whitus v. State,* 216 Ga. 284 (116 SE2d 205); *Burns v. State,* 89 Ga. 527 (5) (15 SE 748); *Burge v. State,* 103 Ga. App. 682, 685 (3) (120 SE2d 200). The facts contended by the appellants clearly show that all threats were made by Capaldi and Kacon by telephone. Even giving full credence to the testimony, such threats had to relate to apprehension of future injury, which does not justify the commission of crime because appellants had an alternative course of conduct. *Proctor v. State,* 139 Ga. App. 794 (229 SE2d 675). The jury was warranted in concluding from the evidence of the conversation between Nick and George that at the time of the sale, everything was all right; and from the conversation overheard on the bug that David, while talking with Capaldi and Kacon, made small talk and expressed no concern, and that neither brother was concerned with his immediate safety at the time of the sale. While the evidence was sufficient to present the issue to the jury (which the trial court did), there was a sufficient question of fact as to coercion that the trial court was not required to grant a directed verdict of acquittal on that ground. *Hill v. State,* 135 Ga. App. 766, 767 (219 SE2d 18).

Likewise, we do not find such a clear case of entrapment so as to warrant a direction of verdict for the appellants. The several cases involving entrapment cited in *Robinson,* supra (*Coleman v. State,* 141 Ga. App. 193 (233 SE2d 42); *Harris v. State,* 139 Ga. App. 675 (229 SE2d 148); *Hall v. State,* 136 Ga. App. 622 (222 SE2d 140); *Harpe v. State,* 134 Ga. App. 493 (214 SE2d 738)) all *found no rebuttal* to the entrapment testimony of the appellant and showed that the asserted entrapment occurred through the actions of an informant

and outside the presence of the authorities. Clearly these cases recognize implicitly that where the state produces rebuttal to the testimony of the appellant, it is not essential for the informer to testify. *Henderson v. State,* 141 Ga. App. 424, 425 (2) (233 SE2d 500).

In this case, the state in rebuttal produced the testimony of George that both appellants manifested a predisposition for dealing in drugs by showing that appellants had possessed a large quantity of Quaaludes prior to the sale in question; had made a sale to the informer on an earlier occasion. The state produced evidence that appellants were interested in this particular sale because of the money; and at the time of the sale, neither appellant gave any indication that they were concerned for their safety; that the Quaaludes came from Nicaragua, and that shortly before the sale, one of the appellants had been to Nicaragua; and that David showed an acceptance of and familiarity with drugs by giving cocaine to Kacon. Once again we observe, that the evidence of the appellants was sufficient to raise the issue of entrapment (properly submitted to the jury); but there also was sufficient rebuttal thereto not to require the direction of a verdict of not guilty as a matter of law because of the failure to produce the informants. These enumerations are without merit.

2. Appellant Henry Chambers enumerates as error (5, 6, 7) the charge and two recharges of the court on the principles of entrapment. Specifically Henry Chambers asserts that the evidence showed that the entrapment was induced by an agent of the police and the trial court by its charge tended to limit the question of entrapment to the inducements of a "police officer." The argument proceeds that the charge would indicate to the jury that entrapment by a police officer is fatal to a conviction but such infection does not result from entrapment by an employee or agent. The trial court in each of the three charges properly defined the affirmative defense of entrapment. That language contained in each instance an admonition that if the entrapment was induced by a government officer, employee or an agent of either under prohibited circumstances or purposes, the appellants must be acquitted. This reference was made twice in each of the three charges. Later in each charge, the court referred only to an officer. However, we note that in addition to the propriety, clearness and correctness of the general charge on entrapment, there was never any contention by the appellants or the state that any person other than Capaldi or Kacon were directly involved in the negotiation for the sale of the Quaaludes. We are convinced that the jury was in no way misled to believe that the charge on entrapment did not apply to Capaldi or

Kacon.

In considering the charge of the court, we will not separate and consider independently each portion of the charge out of context from the meaning of the charge as a whole. To say that references to an officer of the law misled the jury as to Capaldi's and Kacon's status as agents is to ignore the repeated definitional references to "a government officer, or employee or an agent of either," employed by the court in its charge. There is no error, where the instructions when considered as a whole, are unlikely to mislead the jury. *Collins v. State,* 145 Ga. App. 346, 348 (243 SE2d 718). Our examination of the full charge shows that it is perfectly sound. What it might seem to lack when divided is supplied when the whole of the charge is considered. *Walls v. State,* 148 Ga. App. 112, 113 (251 SE2d 103). There is no merit to this enumeration.

3. David Chambers raises in his third enumeration of error a portion of the charge of the court wherein the trial court informed the jury that they had to find the appellants "guilty or innocent" according to the evidence, rather than "guilty or not guilty." The language to which objection was made occurred at the point in the court's charge where the court told the jury that the plea of not guilty and the indictment formed the issue to be determined by the jury. From that issue the jury was told they had to determine if the appellants were guilty or innocent. Thereafter, the trial court repeatedly charged the jury that the proper form of their verdict was either guilty or not guilty. This expression was repeated at least seven or eight times in the court's charge. Our observation in the division immediately above is fully applicable to this enumeration. The jury was fully and properly informed that they had to find the appellants guilty or not guilty based upon the law and evidence submitted to them. *Diaz v. State,* 239 Ga. 365, 368 (236 SE2d 669); *Veasley v. State,* 142 Ga. App. 863, 864 (237 SE2d 464). This enumeration is without merit.

4. Henry Chambers asserts in his eighth enumeration that the trial court erred in failing to strike the testimony of the accomplice George, because such testimony was neither corroborated nor was it in rebuttal of the appellants' testimony concerning the conversations they had with Capaldi or Kacon. We reject this argument out of hand. George's testimony was corroborated in numerous instances by the unfolding drama of the sale. George, for instance, knew there was a drug transaction in progress. He could only have learned from Nick that David was at the scene counting the money and calling for the remaining 10,000 pills. Nick, in turn, could only have learned it from David or Kacon, i. e., a person actively engaged in the criminal enterprise. This activity was corroborated by

the personal observations of the police officers on the scene. In rebuttal, George's testimony tended to show that the Chambers were not duped into the sale, but knew about it, voluntarily participated in it, and had not shown any previous concern for their safety.

Questions of the relevancy of evidence are for the court, *Hotchkiss v. Newton,* 10 Ga. 560. When facts are such that the jury, if permitted to hear them, may or may not make an inference pertinent to the issue, according to the view which they may take of them in connection with the other facts in evidence, they are such that the jury ought to be permitted to hear them. *Walker v. Roberts,* 20 Ga. 15 (1); *Brown v. Wilson,* 55 Ga. App. 262 (1) (189 SE 860). That the challenged testimony falls short of proving the fact sought to be established is not in itself sufficient reason for excluding it, provided that it, alone or in connection with other testimony, tends to prove the matter in issue. *Livingston v. Barnett,* 193 Ga. 640 (3a) (19 SE2d 385). Any evidence is relevant which logically tends to prove or to disprove a material fact which is at issue on the case, and every act or circumstance serving to elucidate or to throw light upon a material issue or issues is relevant. *Harris v. State,* 142 Ga. App. 37, 41 (7) (234 SE2d 798). Only slight corroboration was required, and we conclude that was present. *Atcheson v. State,* 136 Ga. App. 152, 153 (220 SE2d 483). See *Jones v. State,* 139 Ga. App. 643, 646 (229 SE2d 121). Equally apparent is that George's testimony contained some evidence in rebuttal. This enumeration likewise lacks merit.

5. David Chambers argues in his second enumeration of error that it was error for the trial court to admit evidence of the gift of cocaine to Kacon on the ground that it impermissibly placed his character into evidence and worked great prejudice to him. The principal defense offered by David Chambers was that he was innocent of knowledge that a drug sale was contemplated and that he had not been otherwise involved in drug traffic. The evidence objected to tended to show his familiarity with and lack of concern with the criminality of dealing with prohibited substances. Evidence of other crimes is admissible when the extraneous crime forms a part of the res gestae; or is one of a system of mutually dependent crimes; or is evidence of guilty knowledge; or may bear upon the identity of the accused, or articles connected with the offense; or is evidence of prior attempts by the accused to commit the same crime upon the victim of the offense for which he stands charged; or where it tends to prove intent, motive, scheme, or the like, where such element enters into the offense. We find no error in the admission of this evidence. *Natson v. State,* 242 Ga. 618, 620 (250 SE2d 420).

6. In enumeration of error 9, Henry Chambers complains that the trial court erred in failing to suppress the methaqualone (Quaaludes) as the improper product of a search and seizure without warrant. This enumeration is without substantial merit. The officers in question could not have known with any certainty that there would be any Quaaludes at the scene of the sale until David Chambers made his appearance at the parking lot with the two bags of pills. The officers did not know who "Maddog" was or what his address was. Thus, at best, a warrant would have been premature. At the scene the officers saw a crime being perpetrated in their presence. They saw the Quaaludes in plain view both in David's car and on the ground at the rear of Nick's pickup. They then arrested all the participants. After the arrests the drugs in plain view were seized. In this case the seizure (as opposed to a search) is justified as being incident to the arrest (*State v. Handspike,* 240 Ga. 176 (240 SE2d 1); *State v. Mathis,* 143 Ga. App. 121, 122 (237 SE2d 643)); the contraband was in plain view and properly not to be avoided or ignored by the arresting officers (*Bryan v. State,* 137 Ga. App. 169, 170 (223 SE2d 219)) and because of the use of vehicles by the appellants, exigent circumstances justified the seizure (*State v. Bradley,* 138 Ga. App. 800, 802-803 (227 SE2d 776)). This evidence was properly admitted.

7. In Henry Chambers' Enumeration 10 and David Chambers' Enumeration 4, each appellant complains that the trial court erroneously admitted the contents of the conversations overheard by the officers over the "bug" carried by Kacon in the absence of a showing of consent by Kacon. We reject these contentions by the appellants. The officers were present at the time the bug was placed in Kacon's purse and each testified that Kacon gave no indication of lack of consent and that by her conduct, she obviously consented to the use of the device. Thus the officers testified to a fact, not an opinion, nor did they relate any hearsay comments of Kacon. Moreover, the party having the standing to make the objection was Kacon. The conversation between David Chambers, Capaldi and Kacon was a free flowing conversation, made under such circumstances that David could have had no expectation of privacy inasmuch as either Capaldi or Kacon could have divulged the conversation. United States v. White, 401 U. S. 745, 751 (28 LE2d 453); Hoffa v. United States, 385 U. S. 293, 300-303 (17 LE2d 374); *Orkin v. State,* 236 Ga. 176, 179-184 (223 SE2d 61); *Cross v. State,* 128 Ga. App. 837, 838-840 (198 SE2d 338). See *Goodwin v. State,* 154 Ga. App. 46 (1980). This enumeration is without merit.

8. In his eleventh enumeration of error, Henry Chambers argues that the evidence is insufficient to support the conviction as

the defense of entrapment and coercion was established. We have already rejected these contentions. The totality of the evidence produced by the police witnesses, George, and the statements of David made during the progress of the common criminal enterprise (attributable to Henry, as a partner in the sale, *Chesser v. State,* 141 Ga. App. 657, 658 (234 SE2d 121)) conclusively support the jury's finding that the two brothers were engaged in an attempt to sell 20,000 tablets of Quaalude, which equally establishes a charge of possession with the intent to distribute methaqualone. We are completely satisfied that the evidence presented to the jurors and available for their consideration, would have allowed any rational trier of fact reasonably to find the essential elements of the crime charged beyond reasonable doubt. *Boyd v. State,* 244 Ga. 130, 132 (259 SE2d 71); *Turner v. State,* 151 Ga. App. 169, 170 (259 SE2d 171). This enumeration is without merit.

9. In his final enumeration of error, Henry Chambers asserts that the trial court erred in denying his motion for new trial. The grounds for that motion are all identical or similar to the enumerations considered in this opinion. For all the reasons contained hereinabove, we conclude that the trial court did not err in denying the motion for a new trial. This enumeration also lacks merit.

*Judgments affirmed. Deen, C. J., and Sognier, J., concur.*

ARGUED JANUARY 14, 1980 — DECIDED APRIL 28, 1980 — REHEARING DENIED MAY 15, 1980 IN CASE NO. 59252 —

*Daniel F. Byrne,* for appellant (Case No. 59252).
*Stephen E. Boswell,* for appellant (Case No. 59302).
*Robert E. Keller, District Attorney, Michael D. Anderson, Assistant District Attorney,* for appellee.