### 20880. WHITUS v. THE STATE.

ARGUED MAY 9, 1960—DECIDED SEPTEMBER 12, 1960—REHEARING DENIED SEPTEMBER 21 AND OCTOBER 6, 1960.

*P. Walter Jones, R. W. Reynolds,* for plaintiff in error.

*Maston O'Neal, Solicitor-General, Eugene Cook, Attorney-General, Rubye G. Jackson, Assistant Attorney-Generay,* contra.

ALMAND, Justice. Phil Whitus, under an indictment charging him and three others with murder by shooting James E. Glenn to death with a pistol, was on his trial before the court and a jury found guilty and sentenced to death by electrocution. His

motion for a new trial on the general and special grounds being denied, he seeks by this writ of error a review of the order denying a new trial.

The defendant relies here solely on the general grounds of his motion for new trial, the contention being that the evidence conclusively shows that the deceased was shot and killed by the codefendant, Leon' Davis, and that all the evidence shows that, though this defendant was present, aiding and abetting Davis in the killing of Glenn, he could not be found guilty as a principal in the second degree because the evidence demanded a finding that his participation in the crime was not voluntary, but as the result of fear from threats and menaces directed at him by Davis and, therefore, under the provisions of *Code* § 26-402, his conviction was unauthorized.

Counsel for the State rightly concedes that the evidence shows that Davis was the actual perpetrator of the offense. It appears without contradiction that this defendant was present, aiding and abetting Davis in the killing of Glenn. The court gave in charge to the jury *Code* § 26-402, and instructed them that, even if the jury found that the defendant had aided, abetted, or assisted in the killing of Glenn, but that his participation was through fear as the result of threats and menaces of immediate danger to his life or any member, they would not be authorized to convict him. The sole question for decision is: Does the evidence authorize the finding of the jury that the defendant's participation in the killing was voluntary?

A brief summary of the evidence, consisting of the defendant's written statement and the testimony of Daniels, a codefendant, as to the defendant's participation in the killing is as follows: Shortly after midnight on November 15, 1959, James E. Glenn left his home to investigate a disturbance by cursing and loud talking on the public road in front of his house. He found the four defendants. The automobile which Davis had been driving was in a ditch. All of the defendants had been drinking intoxicants. The defendant Whitus knew Glenn and asked him to help them get the car out of the ditch. Glenn said he would, and went to his home, got his .22 calibre pistol, and returned to the scene with his automobile where he discovered that the defend-

ants had succeeded in getting the car onto the road. He, Glenn, followed them down the road, and when he caught up with them, Davis suddenly braked his automobile, causing the front of Glenn's car to strike the rear of the car driven by Davis. The defendants then drove a short distance to the home of Leon Davis with Glenn still following them at a distance. While the other defendants went to the backyard of Davis' house, Davis procured his rifle from the house and went down the road to meet Glenn. Shortly thereafter, Davis returned to the yard with his rifle under his arm and Glenn's pistol in his hand, and fired two shots in the direction of the other defendants and called them to come with him. They joined Davis, and all of them went to the road where they found Glenn's car in a ditch. Glenn asked the defendants to help him get his car out of the ditch and back to his home. Davis returned Glenn's pistol to him. After more conversation about removing Glenn's car from the ditch, Davis cursed Glenn and hit him on his head with the rifle barrel. Davis then took Glenn's pistol again. At the direction of Davis the other defendants put Glenn, who was unconscious, in his car. The defendants then got in Davis' car and drove about four miles. Davis then said: "We are in this thing together and we just as well do it right." Davis asked the defendant what he would do: "Would you leave him in front of your house or get him out in the front of your house?" The defendant replied: "I wouldn't leave him in front of my house. I'd get him out from in front of my house." Davis then said: "I'm going back and kill the son of a bitch now to keep him from talking, cause if he talks he could have all four of us hanged and he'll be walking around here a free man." All of the defendants with Davis driving returned to the Glenn car where they found Glenn in the car and still unconscious. Davis with Glenn's pistol in his hand directed the defendant to get in his car and push the Glenn car, which Davis would steer, to a point where Davis would signal with his hand. The Glenn car was pushed about four miles and then off the road in a wooded area where no one lived. Davis, with the pistol in his hand, ordered the defendants to race the motor while he fired the shots. Davis went back to the Glenn car and fired one shot into Glenn's

head. Glenn's body fell out of the car and Davis fired three more shots into Glenn's head. All of the defendants got into Davis' car, the defendant, Whitus, remarking: "Now we can go home like nothing ain't happened." All of the defendants went to the back of Whitus' house where they had hid their liquor and all except Daniels drank the liquor.

"A person who aids and assists in the commission of a crime or in measures taken to conceal it and protect the criminal, is not relieved from criminality as an accomplice on account of fear excited by threats or menaces, unless the danger be to life or member, nor unless that danger be present and immediate as above announced touching fear under the influence of which perjury is committed." *Burns v. State*, 89 Ga. 527(7) (15 S. E. 748). The evidence in this case as to the defendant's participation in the commission of the crime and efforts to conceal it does not warrant the conclusion that his participation was because of threats or menaces, which put the defendant under fear of immediate danger of his life or a member. The statement, which the defendant made, as testified to by Daniels, the codefendant, after aiding Davis in the brutal killing and concealment of the crime, that "Now we can go home like nothing ain't happened," sounds more like one who was self-satisfied with a job well done than one who was acting under the menacing and threatening domination of another. Under the evidence the jury was authorized to find that the defendant's participation in the crime was voluntary, and that he was guilty of murder as a principal in the second degree.

The evidence supports the verdict, and it was not error to deny the defendant's motion for a new trial.

*Judgment affirmed. All the Justices concur, except Duckworth, C. J., Head, P. J., and Quillian, J., who dissent.*

DUCKWORTH, Chief Justice, dissenting. In full recognition of the established rule of law that holds those parties to a criminal conspiracy or enterprise, who commit no overt act, equally guilty with those who commit the overt acts, I am, nevertheless, simply unable to find any basis either in law or common reason for holding this defendant guilty of murder where all the evidence excludes any possibility of conspiracy among the four, who in-

cluded this defendant and the person who did the killing. They had planned no robbery, theft or other crime, and indeed had no reason to expect to see the deceased before he went to them. Thereafter, this defendant had no dealings, words or feelings with or toward the deceased. Why should he want to harm the deceased? There is positively a complete absence of even a suspicion of any motive. The slayer committed every criminal act that caused the death. He needed no help from this accused other than pushing the car and racing the motor, both of which were done at his command while he held the gun with which he later shot the deceased who had already been knocked unconscious by the killer. To say that this was not enough to cause a reasonable person to fear that a refusal to obey would endanger his life, is to ignore realities and human nature. No act of his harmed a hair of the deceased. Even if he was cowardly and foolish in obeying the murderer, who held a gun, this would not show his guilt of criminal desire or intent. Human life should not be taken by the State with such total lack of evidence of either act or intent as this record shows. Unless he is saved by the clemency of the Pardon and Parole Board, his life will be forfeited for a crime he never committed and had no cause for wanting it committed. If this decision fixes the law, then every person stands in danger of being electrocuted if a murder is committed by someone of his associates even though he had no knowledge that it was going to be done.