Phil WHITUS and Leon Davis, Appellants,

v.

R. P. BALKCOM, Jr., Warden, State Penitentiary, Reidsville, Georgia, Appellee.

No. 20797.

United States Court of Appeals Fifth Circuit.

June 18, 1964.

B. Clarence Mayfield, Savannah, Ga., P. Walter Jones, Albany, Ga., for appellant.

Albert Sidney Johnson, Asst. Atty. Gen., of Georgia, Eugene Cook, Atty. Gen., William L. Grayson, Asst. Atty. Gen., Atlanta, Ga., for appellee.

Before TUTTLE, Chief Judge, WISDOM, Circuit Judge, and CARSWELL, District Judge.

WISDOM, Circuit Judge.

The difficulties this post-conviction habeas corpus problem presents inhere in the dilemma in which a Negro defendant is placed when he is brought to trial in a state court in a county where Negroes are systematically excluded from juries.[1] The matrix within which this problem developed is the social structure of the deep South.

The two Negro petitioners were tried in the Superior Court of Mitchell County, Georgia, for the murder of a white farmer. They were convicted and sentenced to die. Mitchell County is a small county in rural Georgia.[2] No Negro has ever served on a grand jury or on a petit jury in Mitchell County. The attorneys for the petitioners were fully aware of this fact. They were also fully aware of the hostility that an attack on the all-white jury system would generate in a community already stirred up over the killing. Without consulting the defendants, the attorneys decided not to object, in the trial or on appeal, to the systematic exclusion of Negroes from either jury. Later, in this habeas corpus proceeding, the federal district court held that the attorneys' non-assertion in the state court of a timely objection to the composition of the juries was an effectual waiver of that objection.

Many constitutional rights may be waived. And, in the interests of legal economy and the integrity of orderly procedure in state courts, a defendant's non-assertion of certain constitutional rights before a trial or in the early stages of a trial has been treated as a "waiver" of those rights. This handy rule applies, for example, to the right to be tried by a jury or the right to counsel. It does not fit this case.[3]

The core of this case is the lack of remedy in the state courts. The petitioners and their attorneys had no desire to give up their right to be tried by a

1. See Sofaer, Federal Habeas Corpus for State Prisoners: The Isolation Principle, 39 N.Y.U.L.Rev. 78 (1964); Reitz, Federal Habeas Corpus: Impact of an Abortive State proceeding, 74 Harv.L.Rev. 1315, 1324–32 (1961); Hart, Foreword: The Time Chart of the Justices, 73 Harv. L.Rev. 84, 103–108 (1959); Brennan, Federal Habeas Corpus and State Prisoners: An Exercise in Federalism, 7 Utah L.Rev. 423 (1961); Bator, Finality in Criminal Law and Federal Habeas Corpus for State Prisoners, 76 Harv.L.Rev. 441 (1963); Schaeffer, Federalism and State Criminal Procedure, 70 Harv.L.Rev. (1956); See especially Comment, Negro Defendants and Southern Lawyers: Review in Federal Habeas Corpus of Systematic Exclusion of Negroes from Juries, 72 Yale L.Jour. 559 (1963); Note, Lightfoot, Waiver of Right to be Tried Before Jury from which Members of One's Race have not been Systematically Excluded, 16 Ala.L.Rev. 117 (1963). See also Note, Racial Discrimination, Systematic Exclusion in Jury Selection, 24 La.L.Rev. 393 (1964).

2. The population of Mitchell County, according to the 1960 census is about 20,000, 9,000 Negroes and 11,000 white persons.

3. "The rights which a defendant may waive are those which establish procedures designed to insure fairness, but which a particular defendant may deem it advantageous to forego. The clearest example, perhaps, is the right to jury trial, which many defendants waive in the expectation that trial by a judge alone will be beneficial to their cause. * * * ¶ Johnson v. Zerbst permits a defendant to forego some of the constitutional safeguards if he deems it to his advantage to do so. The law respects his choice in the first instance and holds him to it if he should later change his mind. These considerations are not relevant when the defendant 'waives' an opportunity to protest unconstitutional action, in the sense that a violation of a state rule of procedure forecloses some part of the review otherwise available in the state judicial system. If a forfeiture of constitutional rights is to be made the outcome of this kind of lapse, it must be explained on some basis other than an interest in allowing a defendant to follow what seems to him his most advantageous course of action." Reitz, Federal Habeas Corpus: Impact of an Abortive State Proceeding, 74 Harv.L.Rev. 1266, 1333, 1336 (1961).

jury chosen without regard to the race of the jurors. It was not to their interest to do so—except as a choice of evils. A choice of evils was indeed the only state remedy open to them. The petitioners could choose to be prejudiced by the hostility an attack on the all-white jury system would stir up. Or they could choose to be prejudiced by being deprived of a trial by a jury of their peers selected impartially from a cross-section of the community. This is the "grisly",[4] hard, Hobson's choice the State puts to Negro defendants when it systematically excludes Negroes from juries; white defendants are not subjected to this burden.

The constitutional vice is not just the exclusion of Negroes from juries.[5] It is also the State's requiring Negro defendants to choose between an unfairly constituted jury and a prejudiced jury. We hold that this discrimination violates both the equal protection and the due process clauses of the Fourteenth Amendment.[6]

### I.

Simplifying the facts, the homicide occurred November 15, 1959, when Leon Davis, one of the petitioners, killed a respected white farmer after an altercation between the two precipitated by each causing his automobile to bump into the other's automobile. Phil Whitus and two other Negroes were in Davis's automobile and were at the scene of the killing. All four were indicted for murder. The attorneys for the defendants decided against requesting a change of venue.[7] January 13, 1960, the jury found Davis and Whitus guilty as charged.[8] Under Georgia law, since the jury withheld a recommendation of mercy, the verdict carried the sentence of death by electrocution.

The petitioners filed unsuccessful motions for new trials, appeals to the Supreme Court of Georgia, and petitions for certiorari to the United States Supreme Court.[9] Davis contended that the trial court erred in admitting in evidence an allegedly coerced confession and in making an erroneous charge to the jury on insanity. Whitus contended that he did not participate in the killing in any way; that there was no conspiracy to commit any crime; and that whatever assistance he gave to Davis he gave unwillingly at the point of Davis's gun. In the state court proceedings petitioners did not refer to the composition of the juries, except for a vague allusion in the petition for certiorari to the United States Supreme Court.

---

4. This is the term Mr. Justice Brennan used in Fay v. Noia, 372 U.S. 391, 440, 83 S.Ct. 822, 9 L.Ed.2d 837, to describe Noia's predicament.

5. The exclusion of Negroes from petit juries trying Negro defendants has been repeatedly held to violate the equal protection clause as well as the due process clause of the Fourteenth Amendment. Reece v. State of Georgia, 1955, 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 17; Patton v. State of Mississippi, 1947, 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76; Norris v. State of Alabama, 1935, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074; Carter v. State of Texas, 1900, 177 U.S. 442, 20 S.Ct. 687, 44 L.Ed. 839; United States ex rel. Goldsby v. Harpole, 5 Cir., 1959, 263 F.2d 71, cert. den'd 1959, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78.

6. We have based our decision on Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837. At the same time, we have considered, as Mr. Justice Harlan would require the Court to consider, "the adequacy, or fairness, of the state ground".

7. Mr. Walter Jones, attorney for Whitus, testified that he "had a conference with the other attorneys in the case and we agreed that [if a request for a change were made and acted on favorably] the trial judge might change it to Baker County and we were better off in Mitchell."

8. The two other defendants pleaded guilty and were sentenced to life imprisonment. One was sixteen years of age. The other testified for the State.

9. Whitus v. State, 1960, 216 Ga. 284, 116 S.E.2d 205; cert. den'd 1961, 365 U.S. 831, 81 S.Ct. 718, 5 L.Ed.2d 708; Davis v. State, 1960, 216 Ga. 110, 114 S.E.2d 877.

The attorneys first presented the issue now before this Court in a petition for habeas corpus in the United States District Court. That court denied the petition on the ground, among others, that a state remedy through habeas corpus was still available. We affirmed. Whitus v. Balkcom, 5 Cir. 1962, 299 F.2d 844. The Supreme Court, *per curiam*, vacated the judgment and remanded the case. Whitus v. Balkcom, 1962, 370 U.S. 728, 82 S.Ct. 1575, 8 L.Ed.2d 803. Again the district court dismissed the petition.[10] The petitioners are before us on their appeal from that order of dismissal.

The factual question of the existence of the custom of systematic exclusion of Negroes from the Mitchell County juries is not at issue. The appellee relies solely on the doctrine of waiver. The appellee's brief states: "Rather than argue the substantive issue of systematic exclusion of Negroes from the juries of Mitchell County and thereby attempt to overcome this Court's decision in United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, cert. den'd, 1963, 372 U.S. 924, 83 S.Ct. 741, 9 L.Ed.2d 729, appellee will admit for the purposes of this Appeal that the present case is adversely covered by such decision." [11]

## II.

The classic, Johnson v. Zerbst definition of waiver is "an intentional relinquishment or abandonment of a known right or privilege." [12] The general principles governing "waiver" of constitutional rights, as that doctrine is applied in federal habeas corpus post-conviction proceedings, are succinctly stated in Mr.

Justice Frankfurter's separate opinion in Brown v. Allen, 1953, 344 U.S. 443, 503, 73 S.Ct. 397, 444, 97 L.Ed. 469:

"Of course, nothing we have said suggests that the federal habeas corpus jurisdiction can displace a State's procedural rule requiring that certain errors be raised on appeal. Normally rights under the Federal Constitution may be waived at the trial, and may likewise be waived by failure to assert such errors on appeal. When a State insists that a defendant be held to his choice of trial strategy and not be allowed to try a different tack on State habeas corpus, he may be deemed to have waived his claim and thus have no right to assert on federal habeas corpus. Such considerations of orderly appellate procedure give rise to the conventional statement that habeas corpus should not do service for an appeal. *However, this does not touch one of those extraordinary cases in which a substantial claim goes to the very foundation of a proceeding.*" (Citations omitted. Emphasis added.)

The Supreme Court has recently expressed itself on the subject of waiver in Fay v. Noia, 1963, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, a case pertinent here on the facts. The Court said:

"If a habeas applicant, after consultation with competent counsel or otherwise, understandingly and knowingly forewent the privilege of seeking to vindicate his federal claims in the state courts, whether for strategic, tactical, or any other

---

10. The district court held: (1) the evidence was sufficient to support the conviction; (2) there was no evidence to support the contention that there was discrimination in the selection of the jury; (3) there was no violation of the petitioner's right to equal protection or due process.

11. The district court found that there was a complete revision of the jury list two months before the commission of the crime, and the names of thirty Negroes were in the jury box at the time of the

trial. The testimony, however, showed that no Negro had ever served on either the grand jury or the petit jury. The jury lists were based on the names on the County tax returns. These returns were on yellow sheets for the Negroes and white sheets for the whites. See Avery v. Georgia, 1953, 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244. See also Collins v. Walker, 5 Cir. 1964, 329 F.2d 100.

12. Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357.

reasons that can fairly be described as the deliberate by-passing of state procedures, then it is open to the federal court on habeas to deny him all relief * * *. At all events we wish it clearly understood that the standard here put forth depends on the considered choice of the petitioner. Cf. Carnley v. Cochran, 369 U.S. 506, 513–517 [82 S.Ct. 884, 8 L.Ed. 2d 70]; Moore v. Michigan, 355 U.S. 155, 162–165 [78 S.Ct. 191, 2 L.Ed.2d 167]. *A choice made by counsel not participated in by the petitioner does not automatically bar relief.* Nor does a state court's finding of waiver bar independent determination of the question by the federal courts on habeas, for waiver affecting federal rights is a federal question. E. g., Rice v. Olson, 324 U.S. 786 [65 S.Ct. 989, 89 L.Ed. 1367.]" (Emphasis added.)

In addition to its holding on waiver,[13] Fay v. Noia makes it clear that to invoke the Great Writ a petitioner need exhaust only the state remedies available to him *at the time he files his petition.* As to the applicability of the doctrine of "an adequate and independent state law ground", the Court said:

"[T]he doctrine under which state procedural defaults are held to constitute an adequate and independent state law ground barring direct Supreme Court review is not to be extended to limit the power granted the federal courts under the federal habeas statute." 372 U.S. at 399, 83 S.Ct. at 827.

Two recent decisions of this Court deal with waiver in systematic exclusion cases: United States ex rel. Goldsby v. Harpole, 5 Cir. 1959, 263 F.2d 71, cert. den'd 1959, 361 U.S. 838, 80 S.Ct. 58, 4 L.Ed.2d 78 and United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, cert. den'd 1963, 372 U.S. 924, 83 S.Ct. 741, 9 L.Ed.2d 729. Judge Rives was the author of both opinions; the author of this opinion was on both panels. In each case the attorneys for the Negro defendant did not make a timely objection to the composition of the jury. In spite of this non-compliance with the state rule requiring such an objection to be made in the early stages of a trial,[14] this Court held that there was no waiver. In Goldsby "we held that the conduct of Goldsby's counsel without consultation with his client did not bind Goldsby to a waiver of his constitutional right to object to the systematic exclusion of members of his race from the trial jury." [15] With regard to the grand jury, Judge Rives observed that systematic exclusion

13. See Brown v. Allen (Daniels v. Allen), 1953, 344 U.S. 482, 73 S.Ct. 420, 97 L. Ed. 502. "Clarity of anaylsis requires that each device be treated as an isolated doctrine, though such treatment is essentially artificial. If exhaustion is interpreted to include presently unavailable remedies, it would appear that the waiver and adequate-state-ground rules are merely semantic variants of the exhaustion requirement. Application of these principles to a given set of facts produces identical results. Thus, * * * a habeas court could hold that by failing to exhaust a remedy no longer available, petitioner has waived his procedural rights and has created an adequate and independent state ground for his continued detention. No matter which theory is used, petitioner is denied habeas corpus relief for failure to employ a presently unavailable remedy. Once it is decided, however, that the exhaustion requirement applies only to presently available remedies, an applicant would not be penalized under that theory for failing to appeal if he could no longer do so. But such an interpretation of the exhaustion requirement would be rendered nugatory if failure to appeal were to result in a forfeiture under the theories of waiver or adequate state ground. The danger in regarding the doctrines separately is this possibility of antithetical application." Sofaer, supra, Note 1, 39 N.Y.U.L.Rev. 78, 82.

14. See Seals v. State, 1961, 271 Ala. 622, 126 So.2d 474, cert. den'd, 366 U.S. 954, 81 S.Ct. 1909, 6 L.Ed.2d 1246; Cobb v. State, 1962, 218 Ga. 10, 126 S.E.2d 231, cert. den'd 1963, 371 U.S. 948, 83 S.Ct. 499, 9 L.Ed.2d 497.

15. United States ex rel. Seals v. Wiman, 5 Cir. 1962, 304 F.2d 53, 68.

of Negroes from a grand jury involves consequences less serious than the consequences of their exclusion from a trial jury. The Court held that the petitioner had waived any objection to the grand jury. In discussing this case in Seals, however, Judge Rives pointed out: "[In Goldsby] the evidence to support objections to the composition of the jury was entirely unknown to the defendant Seals, who was at no time even consulted by his attorney on this subject. Further, that evidence was not known to the attorney who defended Seals. Finally, that evidence was not 'easily ascertainable' ". 304 F.2d at 69. In Seals, therefore, the Court held that there was no waiver of the constitutional objection to the composition of either the petit jury or the grand jury.

We approve of the holdings in Goldsby and Seals. The important fact in each case was that the attorney for the Negro defendant did not consult his client with regard to his decision to refrain from making an attack on the jury system; and in Seals the evidence relating to systematic exclusion of Negroes from the juries was unknown to the defendant's attorney. Goldsby has been construed as holding that in a capital case "before a defendant will be deemed to have waived his objection to trial by a petit jury infected by an unconstitutional exclusion

for race, the record must show that the defendant, not just his counsel, took the action, deliberately and after advice".[16] Adams v. United States, 5 Cir. 1962, 302 F.2d 307, 314 (dissenting opinion). Goldsby, however, does not go that far. The opinion makes this significant reservation:

"In ordinary procedural matters, the defendant in a criminal case is bound by the acts or nonaction of his counsel. * * * It might extend to such a waiver even in capital cases, where the record affirmatively shows that the particular jury was desired by defendant's counsel after conscientious consideration of that course of action which would be best for the client's cause." 263 F.2d 71 at 83.

The unusual example—for an exclusion case—which Judge Rives gives is the only type of exclusion situation where there is a possibility of a true waiver based on a free option.[17] When a defendant's attorney prefers a particular jury, there is "a voluntary choice between two meaningful alternatives".[18] Absent this preference, there is no voluntary choice to relinquish the right to a fairly constituted jury when the right *must* be relinquished in order not to imperil the defense.[19] Even in a situation where a

---

16. Cf. "Before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant." Patton v. United States, 1930, 281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854. "[C]ourts indulge every reasonable presumption against waiver of fundamental constitutional rights", and "do not presume acquiescence in the loss of fundamental rights". Johnson v. Zerbst, 1938, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461, 146 A.L.R. 357.

17. For example, in Carruthers v. Reed, 8 Cir. 1939, 102 F.2d 933, cert. den'd 1939, 307 U.S. 643, 59 S.Ct. 1047, 83 L.Ed. 1523, the trial attorney knew certain jurors and believed that the defendant would receive a fair trial.

18. Comment, supra, note 1, 72 Yale L. Jour. at 567.

19. Professor Reitz brings out clearly the "great difficulties" that "arise in this attempted transition from 'an intentional relinquishment or abandonment of a known right of privilege' " [Johnson v. Zerbst] to a case involving an abortive state proceeding. ("An abortive state proceeding has occurred when a state criminal defendant, at some time in the past, had an opportunity to present to his own state's courts any question relavant to the power of the state to hold him in custody but lost that opportunity can no longer seek any relief there.") "The most that was waived was the right to review in the state Supreme Court. It takes some additional extrapolation to make that equivalent to waiver of the underlying federal right." Reitz, supra, note 1, 74 Harv.L.Rev. 1335. See also Moyers v. Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 71

defendant's attorney has a considered preference for a particular jury, under the decisions the attorney must consult with his client and the defendant must "understandingly and knowingly" forego his federal claims before a waiver would be established. But if the defendant lacks the capacity "understandingly and knowingly" to waive his right, it is an empty gesture to require consultation and it is meaningless to speak of waiver.

■ To return to the case before us, here the attorneys for the petitioners are able, conscientious, experienced, court-appointed white lawyers.[20] The petitioners are ignorant Negroes whose frame of reference could not have included any comprehension of the traditional constitutional rights incident to a fair trial. Davis is illiterate and Whitus semi-illiterate. The Attorney General for the State, in his brief, makes a point of this in order to further his contention that the defendants are bound by the fictitious waiver of their attorneys:

> "It is evident from the record that defendants were men of lesser intelligence at least in their understanding of the law and were completely dependent upon their attorneys for a proper defense. * * * The testimony of the appellant, Leon Davis, at the first hearing before the District Court for the Southern District of Georgia lucidly points out that he does not comprehend the nature or meaning of the Constitution or the rights provided thereunder and is, in fact, entirely dependent on counsel for his defense."

In these circumstances, it is unrealistic for the Court to attach significance to the presence or absence of consultation of the attorneys with the defendants and the presence or absence of express consent by the defendants to the so-called waiver. For the petitioners in this case, these protections are simply not adequate safeguards against forfeiture of constitutional rights. The defendants would have been no better off after consultation than before; had they been consulted and had they given instructions contrary to the attorneys' advice, they would have been worse off. As the Supreme Court of Georgia said in Cobb v. State, 1962, 218 Ga. 10, 126 S.E.2d 231, cert. den'd 1963, 371 U.S. 948, 83 S.Ct. 499, 9 L.Ed.2d 497:

> "Where, as here, the defendant knows nothing of his rights or whether it would be strategically wise to waive them in certain situations, *it would be to require a vain and useless thing that he personally consent to such waiver.* If appointed counsel had been compelled to consult and be controlled by the directions given him by his client, who was only fifteen years old, and according to his own insistence, knew nothing of law, courts or legal procedure, his usefulness would have been destroyed and the defendant would not have been represented by counsel within the meaning of Article I, Sec. I, Par. V of the Georgia Constitution (Code Ann. § 2–105)." (Emphasis added.)

Cobb involved facts very similar to the facts in the instant case. The futility of requiring an express waiver from the fifteen year old Negro defendant led the Georgia Supreme Court to conclude that

Harv.L.Rev. 1, 6 (1960). In discussing "waiver" of the guarantee against double jeopardy, the authors wrote, "Yet it is obvious that a waiver rationale here, as elsewhere, serves only to state the conclusion without explaining the reason for it." See also Sofaer, supra, Note 1, 39 N.Y.U.L.Rev. 78, 83–91; Comment, Waiver of the Privilege Against Self Incrimination. Note, Waiver of the Privilege Against Self Incrimination, 14 Stan. L.Rev. 811 (1962).

20. The brief of the Attorney General states:
"The court will remember that Honorable P. Walter Jones has represented Phil Whitus from the outset of this case. A fleeting glance at the history of this case proves conclusively that Mr. Jones has exerted every effort in behalf of the appellant and is to be commended for his unselfish and tireless defense of this individual."

**504**

"the waiver may be made on his behalf by counsel appointed by the court to defend him."

Here, as in Cobb, the evidence showed no consultation between the attorneys and the petitioners on waiver and here too the petitioners lacked the comprehension to make an intelligent waiver. If, notwithstanding, the State may treat the attorneys' inaction as implied "waiver", it is because the State, for its purposes, may establish a ground rule that orderly procedures compel a client to be bound by his lawyer's action and inaction [21] and require also that objections to

juries be urged in the early stages of a trial; otherwise, state procedures would be circumvented.

 Such a state rule, so reasonable on its face, is an "independent and adequate state ground",[22] which Federal courts generally should respect. But, as stated in Fay v. Noia, "Federal courts have *power* under the federal habeas corpus statute to grant relief despite the applicant's failure to have pursued a state remedy not available to him at the time he applies." 372 U.S. at 398, 83 S.Ct. at 826.

21. Popeko v. United States, 5 Cir. 1961, 294 F.2d 168; Kennedy v. United States, 5 Cir. 1958, 259 F.2d 883.

22. In Fay v. Noia, 372 U.S. 391, 429–432, 83 S.Ct. 822, 844, 9 L.Ed.2d 837, the Court commented: "The fatal weakness of this contention is its failure to recognize that the adequate state-ground rule is a function of the limitations of *appellate* review. * * * And so we have held that the adequate state-ground rule is a consequence of the Court's obligation to refrain from rendering advisory opinions or passing upon moot questions. ¶ But while our appellate function is concerned only with the judgments or decrees of state courts, the habeas corpus jurisdiction of the lower federal courts is not so confined. The jurisdictional prerequisite is not the judgment of a state court but detention *simpliciter*. The entire course of decisions in this Court elaborating the rule of exhaustion of state remedies is wholly incompatible with the proposition that a state court *judgment* is required to confer federal habeas jurisdiction. And the broad power of the federal courts under 28 U.S.C. § 2243 summarily to hear the application and to 'determine the facts, and dispose of the matter as law and justice require,' is hardly characteristic of an appellate jurisdiction. Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him. Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner. * * * In Noia's case the only relevant substantive law is federal— the Fourteenth Amendment. State law appears only in the procedural framework for adjudicating the substantive federal question. The paramount interest is federal. Cf. Dice v. Akron, C. & Y. R. Co., 342 U.S. 359 [72 S.Ct. 312, 96 L.Ed. 398]. That is not to say that the States have not a substantial interest in exacting compliance with their procedural rules from criminal defendants asserting federal defenses. Of course orderly criminal procedure is a desideratum, and of course there must be sanctions for the flouting of such procedure. But that state interest 'competes * * * against an ideal * * * [the] ideal of fair procedure.' Schaefer, Federalism and State Criminal Procedure, 70 Harv.L.Rev. 1, 5 (1956). And the only concrete impact the assumption of federal habeas jurisdiction in the face of a procedural default has on the state interest we have described, is that it prevents the State from closing off the convicted defendant's last opportunity to vindicate his constitutional rights, thereby punishing him for his default and deterring others who might commit similar defaults in the future." Cf. Williams v. Georgia, 1955, 349 U.S. 375, 393–405, 75 S.Ct. 814, 99 L.Ed. 1161. In McKenna v. Ellis, 5 Cir., 1960, 280 F.2d 592, 603 rehearing denied and opinion modified, 289 F.2d 928, cert. den'd 1961, 368 U.S. 877, 82 S.Ct. 121, 7 L.Ed.2d 78, this Court granted habeas corpus although the prisoner had not complied with Texas procedure. We held: "Article 543 of the Texas Code of Criminal Procedure sets forth very clearly the requirements for a continuance. We do not question the propriety, the reasonableness, the constitutionality of Article 543. * * * 'Such detailed and technical requirements of a motion for continuance, no doubt, serve a salutary purpose in a proper case, but they cannot justify putting a defendant to trial when he has been given no fair opportunity to secure the attendance of his witnesses.' "

 The overriding duty of a federal court to protect the federally guaranteed rights of the individual citizen impels the court to inquire into the reasonableness, the constitutionality, of the state rule. "Reasonable consequences attached by the states to a failure to comply with reasonable rules must accordingly be respected. * * * But this assuredly does not mean that every last technicality of state law must be sacrosanct." Hart, Foreword: Time Chart for the Justices, 73 Harv.L.Rev. 84, 118 (1959). Professor Hart's comments on a state rule that the escape of a prisoner nullifies his motion for a new trial [23] are apt here:

"The reasonableness of the state rule and, even more, the reasonableness of its application in the particular circumstances of the case cried aloud for questioning. Life was at stake. The constitutional rights which the prisoner asserted went to the very jugular of a system of ordered liberty—the right to be judged in an orderly trial before an unprejudiced tribunal rather than by the whipped-up emotions of the community. States may punish an escape as a crime. But surely not all rights to a fair trial can become forfeit because of it. Especially are doubts stirred when the escape in question can be viewed as a form of self-protection from the very community hostility against which the prisoner had previously protested in vain by lawful means. These considerations called for close scrutiny of the opposing considerations advanced by the state to show that the forfeiture it had decreed was necessary for the due enforcement of law." 73 Harv. L.Rev. at 116.

### III.

This case is "one of those extraordinary cases" Mr. Justice Frankfurter may have had in mind in the caveat to his discussion of waiver in Brown v. Allen: the federal "claim goes to the very foundation of [the] proceeding". When Negroes are systematically excluded from juries, the fictitious waiver rule puts Negro defendants, and only Negro defendants, to a choice of evils that deprives them of an effective remedy.

A. We know what happens when the attorney's inaction is treated as a waiver of the exclusion issue: the Negro defendant loses the benefits of a trial by his peers. We quote two sentences on the subject from a Supreme Court opinion in 1879:

"The very idea of a jury is a body of men composed of the peers or equals of the person whose rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds. * * * [C]ompelling a colored man to submit to a trial for his life by a jury drawn from a panel from which the State has expressly excluded every man of his race, because of color alone, however well qualified in other respects, is * * * a denial to him of equal protection of the law." Strauder v. West Virginia, 1879, 100 U.S. 303, 309, 25 L.Ed. 664.

B. We believe that we know what happens when a white attorney for a Negro defendant raises the exclusion issue in a county dominated by segregation patterns and practices: both the defendant and his attorney will suffer from community hostility.

The burden of making hard decisions is one that attorneys are used to carrying. But the burden is exceptionally heavy when the life and liberty of an accused depend on the weight to be given something as imponderable as the extent of the additional anti-Negro reaction that would be engendered by attacking the all-white jury system. As if this were not sufficiently difficult, there is the intolerable complication that the reaction against an attorney who raises the exclusion issue may stretch from persiflage to

**23.** See Irvin v. Dowd, 1959, 350 U.S. 394, 70 S.Ct. 825, 3 L.Ed.2d 900.

ostracism. The intensity of the reaction will depend on how bad racial relations are in the particular county, the standing of the defendant's attorney at the bar and in his community, the happening of unpredictable local events, and coincidental accidents of history. The reprisals may be real or chimerical; if chimerical, they may seem real to any particular attorney. All of this adds up to pressures which may, consciously or subconsciously, affect an attorney's measured evaluation of which evil is the lesser evil in this Hobson's choice of evils.[24] Later, should there be a post-conviction habeas corpus proceeding, the attorney's knowledge that his integrity may be questioned and his professional skill second-guessed in an antagonistic atmosphere may cause him to slant his explanation for making the wrong guess.

The exposure of a Negro on trial for his life to these factors destructive of justice and federally protected rights and harmful to the public policy of encouraging adequate legal representation of indigents is a monstrous price to pay for the convenience to the state of the procedural rule euphemistically termed "waiver".[25]

C. We turn now to the bases in the decision-making process for judicial consideration of these matters.

(1) We start with a *fair inference*. If the segregation policy in a county is so strong that Negroes are systematically excluded from the jury system, community hostility would be generated against any "trouble-maker" who would attempt to upset the all-white make-up of the jury system. Such hostility would directly affect the Negro defendant. It would carry

24. "In response to a questionnaire prepared by the *Journal* and sent to 100 southern lawyers whose names were picked at random, 20 stated that they felt the Fifth Circuit was correct in taking judicial notice that lawyers in the South rarely raise the issue of jury exclusion. Fourteen felt the Fifteen Circuit was incorrect either because there is no jury exclusion (9) or because the issue is raised when the facts so warrant (5).

"In answer to the question whether you would 'raise at trial level the issue of systematic exclusion of Negroes from the jury, if you thought there was reasonable evidence of such exclusion,' 21 answered yes and 13 responded no.

"Reasons given for the failure to raise the objection included a desire not to prejudice the lawer's position in the community (2), a desire not to prejudice the client's interests by stirring up community feeling against him, thereby hoping to achieve the best result for the Negro client (11), and a feeling that it would make no difference to the outcome of the case whether or not there is jury exclusion (15).

"In response to the questionnaire prepared by the *Journal*, one Alabama lawyer wrote:

"'If I accepted a Negro for jury duty and put him on with 11 white men I would prejudice the white men against me and my client.'

"A lawyer in Florida wrote:

"'It has been my observation and it is my present thinking that the interests

of a Negro client in the South would be better protected by the white man than colored.'"

Comment, Negro Defendants and Southern Lawyers: Review in Federal Habeas Corpus of Systematic Exclusion of Negroes from Juries, 72 Yale L.Jour. 559, 565 (1963).

25. "It is relevant to ask, for purposes of a corollary to the federal exhaustion rule, whether the price of utilizing the state remedies was too great * * * This is particularly significant in the case of the Negro defendant who had to give up the chance of an unprejudiced trial in order to raise the constitutional objections at the time prescribed by state procedural law. In some circumstances, the situation might be such that the defendant could not be said to have had an effective state remedy available to him, even though formally a method for challenging the juries existed. But even in less extreme cases, there ought to be serious doubt that a defendant should be put to this Hobson's choice with respect to a constitutionally guaranteed right. ¶ Not everyone will agree that the federal courts should go to the merits of these applications. It seems to me, however, that entertaining them would not pose a serious threat to the general requirement of exhaustion of state remedies, since the factors which governed the actions of the defendants were unrelated to the exhaustion rule." Reitz, supra, Note 1, 74 Harv. L.Rev. at 1372.

over and affect the defendant's attorney. Whether horrendous or merely embarrassing, the prospect of social extra-legal pressures distorting an attorney's judgment is a burden only Negro defendants bear.

(2) In Goldsby we took *judicial notice* of the fact that in some areas in the deep South lawyers almost never raised the exclusion issue.[26] We said:

"Moreover, the very prejudice which causes the dominant race to exclude members of what it may assume to be an inferior race from jury service operates with multiplied intensity against one who resists such exclusion. * * * Such courageous and unselfish lawyers as find it essential for their clients' protection to fight against the systematic exclusion of Negroes from juries sometimes do so at the risk of personal sacrifice which may extend to loss of practice and social ostracism. ¶ As Judges of a Circuit comprising six states of the deep South, we think that it is *our duty to take judicial notice* that lawyers residing in many southern jurisdictions rarely, almost to the point of never, raise the issue of systematic exclusion of Negroes from juries." (Emphasis added.) 263 F.2d at 82.

The effect will, of course, be accentuated if the case is one involving the murder of a white man by a Negro or the rape of a white woman by a Negro or if the timing of a trial should happen to coincide with fevers running high because of bad racial relations.

(3) The fact, standing alone, that no Negro has ever served on a jury in the particular county where his case is tried strongly indicates, if it does not create a presumption, that there was a tacit agreement by the bar of that county not to raise the constitutional issue. In such case the Negro would have no adequate remedy, either because of the powerful environmental factors infecting the jury system or because of ineffective representation by counsel. At the very least, that fact alone *establishes a prima facie case* putting the burden of going forward on the State to show that there was a true waiver; that the non-assertion of the defendant's constitutional right was not caused by environmental pressures or ineffective representation by the defendant's attorney.

(4) This case is a doubly strong one for the defendant because, unlike Goldsby,[27] we have the benefit of *specific testimony from Whitus's trial attorney* on the motivation for his non-action. As we noted in Goldsby, "Conscientious southern lawyers often reason that the prejudicial effects on their client of raising the issue far outweigh any practical protection in the particular case." 263 F.2d at 82. Here, Mr. Walter Jones, attorney for Whitus, testified that he had hopes for an acquittal of his client on the charge of murder, whatever other offense he might have committed. In the habeas corpus hearing Mr. Jones testified:

"Q. Did you confer with Phil Whitus and receive his express permission to waive his objection to the trial jury unconstitutionally se-

26. McNaughton, Judicial Notice-Excerpts Relating to the Morgan-Wigmore Controversy, 14 Vand.L.Rev. 778, 789 (1961); McCormick, Judicial Notice, 5 Vand.L. Rev. 296, 315 (1952).

27. In Goldsby, the defendant's first lawyer, a Negro, was willing to raise the exclusion issue. His white lawyer refused to join with the Negro lawyer in representing the defendant and did not raise the exclusion issue after the Negro lawyer left the case. The attorney's failure to raise the issue and the lack of any ex-

planation could give rise to the inference that the trial counsel was not acting in the best interests of his client. In Goldsby, however, we said as we do here, that sometimes raising the issue may cause more prejudice than it is worth. The necessity for the attorney making this choice, not just the composition of the jury, is the constitutional vice. See Comment, Negro Defendants and Southern Lawyers: Review in Habeas Corpus of Systematic Exclusion of Negroes from Juries, 72 Yale L.Jour. 559, 564 (1963).

lected and discriminatorily selected?

"A. No, I did not.

"Q. Why did you not raise this question on the trial of Phil Whitus in Mitchell County, Georgia?

"A. Well, I had talked to Phil Whitus and I conferred with the attorneys who represented the other defendants and I knew approximately what they would testify and I *had hopes that I could obtain an acquittal under the facts as I knew them, and I realized that the case had created quite a bit of notoriety and to have brought up such a question at the lower court would have filled the air with such hostility that an acquittal would have been almost impossible.*

\* \* \* \* \* \*

"Q. The Solicitor General asked you just now if you requested a change of venue. Did you have a conference with the judge concerning the possibility of that?

"A. No, sir. I had a conference with the other attorneys in the case and we agreed that he might change it to Baker County and we were better off in Mitchell.

"Q. Would there have been the same discrimination in Baker County?

"A. Yes, sir.

"Q. As I understand, you said that *the reason for not raising the question of discrimination was because you thought it would create a hostile feeling and would hurt your client?*

"A. Yes, sir." (Emphasis added.)

The measure of the merits of Whitus's defense and the measure of his dilemma is that the Chief Justice and two other members of the Supreme Court of Georgia agreed with Mr. Jones's theory of the case and wrote a strong dissent.[28]

D. In Fay v. Noia the defendant was also confronted with a "grisly" choice. In that case a defendant was convicted of murder. Years later, long after his time for appeal had expired, he applied for habeas corpus on the ground that he had been convicted on the basis of a coerced confession. The Supreme Court held that the petitioner's failure to ap-

28. In his dissenting opinion, Chief Justice Duckworth said:

"In full recognition of the established rule of law that holds those parties to a criminal conspiracy or enterprise, who commit no overt act, equally guilty with those who commit the overt acts, I am, nevertheless, simply unable to find any basis either in law or common reason for holding this defendant guilty of murder where all the evidence excludes any possibility of conspiracy among the four, who included this defendant and the person who did the killing. They had planned no robbery, theft or other crime, and indeed had no reason to expect to see the deceased before he went to them. Thereafter, this defendant had no dealings, words or feelings with or toward the deceased. Why should he want to harm the deceased? There is positively a complete absence of even a suspicion of any motive. The slayer committed every criminal act that caused the death. He needed no help from this accused other than pushing the car and racing the motor, both of which were done at his command while he held the gun with which he later shot the deceased, who had already been knocked unconscious by the killer. To say that this was not enough to cause a reasonable person to fear that a refusal to obey would endanger his life, is to ignore realities and human nature. No act of his harmed a hair of the deceased. Even if he was cowardly and foolish in obeying the murderer who held a gun, this would not show his guilt of criminal desire or intent. Human life should not be taken by the State with such total lack of evidence of either act or intent as this record shows. Unless he is saved by the clemency of the Pardon and Parole Board, his life will be forfeited for a crime he never committed and had no cause for wanting it committed. If this decision fixes the law, then every person stands in danger of being electrocuted if a murder is committed by someone of his associates even though he had no knowledge that it was going to be done." Whitus v. State, 116 S.E.2d at 207.

peal in the state court was not a waiver of his rights and did not bar habeas corpus relief. The Court first eliminated the possibility of any express waiver: "A choice made by counsel not participated in by the petitioner does not automatically bar relief." Mr. Justice Brennan, for the majority, then explained why Noia's choice not to appeal was not a matter of trial strategy or a deliberate attempt to by-pass state procedures:

> "Under no reasonable view can the State's version of Noia's reason for not appealing support an inference of deliberate by-passing of the state court system. For Noia to have appealed in 1942 would have been to run a substantial risk of electrocution. His was the *grisly choice whether to sit content with life imprisonment or to travel the uncertain avenue of appeal which, if successful, might well have led to a retrial and death sentence.* See, e. g., Palko v. Connecticut, 302 U.S. 319 [58 S.Ct. 149, 82 L.Ed. 288]. He declined to play Russian roulette in this fashion. This was a choice by Noia not to appeal, but under the circumstances it cannot realistically be deemed a merely tactical or strategic litigation step, or in any way a deliberate circumvention of state procedures."

Recently a commentator has observed the analogy between the defendant's situation in the Noia case and the defendant's position in the instant case "in that here he must choose whether to assert his constitutional right with a possibility of forfeiting his chances for an unprejudiced trial, or remain silent and gamble on the outcome of the trial with the possibility of raising the question later if the outcome proves unsatisfactory". Note, 16 Ala.L.Rev. 117 (1963).[29] The instant case, however, is a stronger case than Fay v. Noia for habeas corpus relief. Noia could have exercised his right to appeal without suffering any constitutional deprivation. But here, in order for the petitioners to exercise their right to a jury from which Negroes were not excluded, the petitioners had to compromise their right to a fair trial on the merits of their defense.

### IV.

We summarize. Taking waiver as the "intentional relinquishment or abandonment of a known right or privilege", the facts show that the petitioners made no "deliberate", meaningful waiver of their objection to systematic exclusion of Negroes from the juries in Mitchell County. Taking "waiver" as a formula standing for the rule that non-assertion of an objection to state procedures vitiates the objection, we hold: under Fay v. Noia, in a federal habeas corpus proceeding the court cannot permit a state ground rule to frustrate the federally guaranteed right to a fair trial before a fairly constituted jury. We do not say that "no waiver can

29. The note is on Ex parte Aaron, Ala., S.Ct. 1963, 155 So.2d 334. On the authority of Seals v. State, 1961, 271 Ala. 622, 126 So.2d 474, cert. den'd 1961, 366 U.S. 954, 81 S.Ct. 1909, 6 L.Ed.2d 1246, the Court held that the defendant, a Negro indicted for the rape of a white woman, had waived the systematic exclusion issue. At arraignment, in answer to a question from the trial judge, the defendant's attorney stated that they did not intend to attack either the grand jury or the petit jury venire because of "the racial make-up of such grand jury or petit jury venire". The note concludes, "Thus, the Alabama court has yet to recognize the principle advanced in the Noia case—that even a knowing failure to assert this particular constitutional right does not constitute a waiver, or, more concisely, that there can *be* no waiver at the present time of this constitutional right. * * * Would it not be better to align [Alabama's] concept of waiver with that set out in the Noia case, thereby enabling defendants, by coram nobis in state courts, to assert the right for the first time, rather than forcing an unsuccessful defendant into the federal courts on habeas corpus when the obvious result will be a federal decision overturning a decision of our highest state court, with the chafing effect it will undoubtedly have on federal-state relations?" Note, 16 Ala.L.Jour. 117, 123 (1963).

be effective if some adverse consequences might reasonably be expected to follow the exercise of that right." [30] We say that the doctrine of fictitious waiver is unacceptable when the state compels an accused person to choose between an unfairly constituted jury and a prejudiced jury. In short, while giving full effect to the holding of the majority in Fay v. Noia the Court has attempted to answer the basic question Mr. Justice Harlan asked in his dissenting opinion: "Whether the choice made by the defendant is one that the State could constitutionally require." [31] We hold that the State could not constitutionally require the petitioners to make a guess and a gamble between two evils. This burden, which only Negro defendants bear, violates the requirements of due process and equal protection of the laws guaranteed by the Fourteenth Amendment.

\* \* \*

██ As in Goldsby and Seals, the Court expresses its present opinion that a period of eight months from and after the entry of this judgment or its final test by certiorari, or otherwise, will be sufficient to afford the State an opportunity to take the necessary steps to reindict and retry the petitioners. Any such reindictment must of course be by a grand jury from which Negroes have not been systematically excluded, and any such retrial must be before a jury from which Negroes have not been systematically excluded, or before some court or tribunal so constituted as not to violate the petitioners' constitutional rights. For the guidance of the parties, the Court expresses the present opinion that if petitioners are reindicted and retried and if any question should arise as to the legality or constitutionality of such indictment or trial, that should be decided not upon the present petition but in the regular course by the Courts of the State of Georgia, subject to possible review by the Supreme Court of the United States.

The judgment of the district court is reversed, judgment here rendered in accordance with the holdings of this opinion, and the cause remanded for any further proceedings which may be found necessary or proper.

Reversed, rendered, and remanded.

CARSWELL, District Judge (concurring specially):

Sharing fully the Courts' view that there was no meaningful waiver by these appellants of their basic Constitutional right to face trial by jurors selected without systematic racial exclusion, I, therefore, concur in the basic holding of the Courts' opinion.

---

**30.** Fay v. Noia, 1963, 372 U.S. 391, 472, 83 S.Ct. 822, 9 L.Ed.2d 837 (dissenting opinion).

